UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

In re:

CASCADE AG SERVICES, INC.,

Debtor.

NO. 12-18366-KAO

AUCTION REPORT

I, Leo Rosenberger, declare and state as follows:

1.  I am over the age of eighteen (18), competent to testify herein, and I make this declaration of my own personal knowledge.

2.  I am the Managing Director of Red to Black Advisors, LLC ("**RBA**"), the duly appointed sales agent in the above-captioned matter.

3.  This Court previously approved the auction (the "**Auction**") of substantially all of the assets of debtor Cascade Ag Services, Inc. (the "**Debtor**") which took place on July 30, 2013. As evidenced by the declarations on file, the Debtor's counsel duly gave notice of the Auction and related sale procedures (the "**Sale Procedures**," *see* Dkt. 512) to parties identified to have an interest in participating.  All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Procedures.

4.  I received Qualified Bids from seven parties: Triak Holdings, LLC (the "**Stalking Horse**," or "**Triak**"); OND Farms, LLC; Kruger Foods, Inc. ("**Kruger**," whose bid was qualified

AUCTION REPORT - 1

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

{02352859.DOCX;1-}

1 subject to certain conditions that were satisfied before the Auction commenced); One

2 PacificCoast Bank; Columbia State Bank; Washington Federal; and Mark Calvert (whose bid

3 was qualified subject to certain conditions that were not satisfied before the Auction

4 commenced). Because Mr. Calvert's conditionally qualified bid failed to satisfy the outstanding

5 conditions to qualification prior to the Auction, Mr. Calvert did not participate in the Auction.

6 The remaining bidders (the "**Final Bidders**") all attended and participated in the Auction.

7       5.       In addition to myself and the Final Bidders' representatives, others attending the

8 Auction on July 30, 2013 were the Final Bidders' counsel and advisors, the Debtor's counsel,

9 counsel for the Official Committee of Unsecured Creditors, and a representative from Skagit

10 Farmers Supply, who, as a secured creditor, was allowed to observe the Auction pursuant to the

11 Sale Procedures. A court reporter was also present.

12       6.       Bidding at the Auction took place in seven total rounds. Several bids were placed

13 throughout the Auction, including both all-assets and component bids. The sixth round of

14 bidding closed after Triak placed a $4,135,000 cash bid for substantially all of the Debtor's

15 assets. After the seventh round of bidding began, each of the other Final Bidders stated that it

16 was no longer interested in bidding, thus ending the Auction.

17       7.       After examining the bids submitted by the Final Bidders, I have determined that

18 Triak's last bid for substantially all of the Debtor's assets is the Winning Bid, and that Triak is

19 the Winning Bidder. The Winning Bid is in the amount of $4,135,000, to be paid in cash at

20 closing. Attached hereto as **Exhibit A** is an executed asset purchase agreement ("**APA**") that

21 sets forth the terms of the Winning Bid. The terms of the Winning Bid are substantially the same

22 as those in the Stalking Horse APA previously filed with the Court on June 21, 2013 at Dkt. No.

23 490, with the following material changes: (1) the total purchase price has increased to

24 $4,135,000; (2) Triak anticipates transferring 10% (rather than *up to* 10%) of its preferred, non-

25 voting membership units to a trust or other entity for the benefit of unsecured creditors; and (3)

26 Triak agrees to assume the Debtor's Rural County Sales and Use Tax Deferral Certificate.

AUCTION REPORT - 2

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

{02352859.DOCX;1}

8.      To the best of my knowledge, Triak is not related to the Debtors, and the Debtors will retain no interest in the Acquired Assets (as defined in the APA) after the sale closes. I recommend, therefore, that the Court enter an order approving the sale of the Acquired Assets to Triak. I believe that at this time, Triak is still determining what, if any, executory contracts it wishes to assume; however, to the best of my knowledge, the Debtor does not have any executory contracts.

9.      The Sale Procedures also require RBA to designate an Alternative Bidder. Based on my review of the bids so far, I believe I must designate two possible Alternative Bidders. The first is OND Farms, LLC's bid of $3,817,000 for substantially all of the Debtor's assets, which bid consists of: (1) $3,250,000 cash at closing; (2) assumption of post-petition payroll wage liability of $278,000; (3) assumption of post-petition accounts payable of $289,000; (4) 5% equity to unsecured creditors, with another 5% earnable on the second anniversary of closing, if the company earns at least $400,000 net profits in the year preceding the anniversary.

10.      The second Alternative Bidder consists of a combination of Final Bidders who each submitted component bids, as follows: (1) Kruger's bid of $2,650,000 cash for (a) the Debtor's brand names and trademarks of "Pleasant Valley," (b) all raw material inventory, (c) all finished goods, (d) certain equipment, and (e) assignment of the Debtor's Department of Ecology permit, to the extent assignable—all subject to reasonable access to remove purchased inventory from the Debtor's facilities; (2) One PacificCoast Bank's $700,000 credit bid (based on its pre-petition loan) for the Debtor's accounts receivable; (3) Washington Federal's $450,000 credit bid for certain equipment not included in Kruger's bid; and (4) Columbia State Bank's $285,000 credit bid for all equipment not subject to either Kruger's or Washington Federal's bid. The aggregate amount of the foregoing component bids is $4,085,000.

11.      RBA designates two Alternative Bidders at this time because additional analysis is required to determine which of the Alternative Bidders has presented the higher and *better* bid in terms of benefit to the estate. This is because one of the Alternative Bids is an all-assets,

AUCTION REPORT - 3

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

going-concern bid, whereas the other Alternative Bid is a component bid.

I DECLARE UNDER PENALTY OF PERJURY OF THE LAWS OF THE STATE OF WASHINGTON AND THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.

DATED this 1st day of August, 2013.

/s/   Leo Rosenberger
Leo Rosenberger

AUCTION REPORT - 4

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

{02352859.DOCX;1}

Case 12-18366-KAO    Doc 554    Filed 08/02/13    Ent. 08/02/13 17:14:26    Pg. 4 of 97

# ASSET PURCHASE AGREEMENT

## AGREEMENT SUMMARY

| | | |
|---|---|---|
| 1. | **Purchaser**: | Pleasant Valley Farms, LLC, f/k/a Triak Holdings, LLC |
| 2. | **Purchaser Address**: | C/O Andrew Anderson 1730 Aimco Blvd., Mississauga, L4W1V1 Ontario, CANADA |
| 3. | **Purchaser Phone**: | Andrew Anderson     905-624-0356  x369 Beth Kawaja            323-578-1793 |
| 4. | **Purchaser Email**: | AAnderson@Whytes.ca; BKawaja@Whytes.ca |
| 5. | **Purchase Price**: | $4,135,000.00 See also Section 2.4 |
| 6. | **Deposit**: | $300,000.00 |

7. **Assets to be Purchased (check one)**:

         x   The "Acquired Assets" as currently set forth in Section 2.1 below; or

         ☐   The following assets which shall replace the list of "Acquired Assets" currently set forth in Section 2.1:

_____

_____

_____

_____

_____

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "*Agreement*") is entered into as of this 2nd day of August, 2013 by and between Pleasant Valley Farms, LLC, a Washington limited liability company formerly known as Triak Holdings, LLC ("*Purchaser*"), and **Cascade Ag Services, Inc., a Washington corporation** ("*Seller*" or "*Debtor*"), by and through **Red2Black Advisors, LLC**, as the Court authorized Sales Agent.

## RECITALS:

A.      Cascade Ag Services, Inc. is a vegetable processing company that produces a variety of pickle, relish, sauerkraut, and pepper products for the institutional and retail food markets.

B.      Cascade Ag Services, Inc. filed a voluntary petition (the "*Petition*") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "*Bankruptcy Code*"), on August 13, 2012 (the "*Petition Date*") in the United States Bankruptcy Court for the Western District of Washington (the "*Bankruptcy Court*"), commencing bankruptcy case number 12-18366-KAO (the "*Bankruptcy Case*"). Cascade Ag Services, Inc. is a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code, subject to Recital C below.

C.      On May 23, 2013, the Bankruptcy Court entered an order setting forth a general timeline for the sale of the Debtor's assets and on May 30, 2013, the Bankruptcy Court approved the appointment of Leo Rosenberger, Managing Director of Red2Black Advisors, LLC, as the duly appointed sales agent (the "*Sales Agent*") to oversee the asset sale.

D.      Purchaser desires to purchase certain assets from Seller and Seller desires to sell, convey, assign, and transfer to Purchaser such assets pursuant to the terms and conditions of this Agreement.

E.      The purchase and sale of the assets pursuant to the terms of this Agreement will be pursuant to order(s) of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code and the assumption and assignment of the Assumed Executory Contracts (as defined below and if required) under Section 365 of the Bankruptcy Code.

## ARTICLE 1
## DEFINITIONS

**Section 1.1     Defined Terms**. All references to "sections" or "articles" are references to sections or articles of this Agreement unless otherwise stated. As used in this Agreement, the terms below shall have the following meanings:

{02354287.DOCX;1 }

Asset Purchase Agreement - 2

"***Accounts Receivable***" shall mean all accounts and notes receivable of Seller and other rights to payment (whether current or noncurrent) outstanding as of the Closing Date, including in respect of goods shipped, products sold, licenses granted, services rendered or otherwise associated with the business of Seller, and all claims, remedies and/or causes of action related to the foregoing.  Notwithstanding the preceding sentence, Accounts Receivable shall not include any accounts or other rights to receive payment for sales related to the Blueberry Business (as defined in Section 2.3(a)).

"***Acquired Assets***" shall have the meaning set forth in Section 2.1.

"***Affiliate***" shall have the same meaning as in the Bankruptcy Code.

"***Agreement***" shall have the meaning as described in the Preamble herein.

"***Alternative Transaction***" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation or other similar transaction, including a plan of reorganization approved by the Bankruptcy Court, or resulting from the Auction, of a material portion of Seller's assets, in a transaction or series of transactions with one or more Persons other than Purchaser.

"***Assumed Executory Contracts***" shall have the meaning set forth in Section 2.2(b).

"***Assumed Liabilities***" shall have the meaning set forth in Section 2.2.

"***Auction***" shall mean the auction conducted by the Sales Agent on July 30, 2013, pursuant to the Bidding Procedures Order.

"***Bankruptcy Action***" and "***Bankruptcy Actions***" shall have the meaning set forth in Section 2.3(b).

"***Bankruptcy Case***" shall have the meaning as described in the Recitals.

"***Bankruptcy Code***" shall have the meaning as described in the Recitals.

"***Bankruptcy Court***" shall have the meaning as described in the Recitals.

"***Bid***" shall mean any bid, whether written or verbal, offered by Purchaser before or during the Auction.

"***Bidder***" shall have the meaning set forth in Section 6.5.

"**Bidding Procedures Order**" means the Bankruptcy Court's Order Approving Sale Procedures, entered on June 28, 2013 in substantially the form attached hereto as <u>Exhibit A</u>.

"**Blueberry Business**" shall have the meaning set forth in Section 2.3(a).

"**Books and Records**" shall mean all books and records pertaining to the Acquired Assets of any and every kind, including, without limitation, lists, program inventory lists, engineering information, sales and promotional literature, manuals and data, sales and purchase correspondence, title reports and policies, files and records relating to management and administration of any and all leases, store layout and fixturing plans, lists of present, former and prospective suppliers or customers, correspondence, compact disks, compact disk lists, ledgers, files, reports, plans, drawings and operating records of every kind, held or maintained by Seller, disk or tape files, printouts, runs or other computer-prepared information pertaining to the Acquired Assets, but excluding corporate books and records of the type described in the definition of Excluded Assets.

"**Business**" means the activities carried on by Seller and any of its Affiliates relating to Seller's Business, excluding the Blueberry Business but including, without other limitation, vegetable harvesting and processing and the production and sale of pickle, relish, sauerkraut, and pepper products.

"**Business Day**" shall mean any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of Washington or is a day on which banking institutions located in the State of Washington are authorized or required by law or other governmental action to close.

"**Claim**" shall have the meaning set forth in Section 101(5) of the Bankruptcy Code.

"**Closing**" shall have the meaning set forth in Section 3.1.

"**Closing Date**" shall have the meaning set forth in Section 3.1.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Computers**" means all computer Equipment and hardware, including, without limitation, all central processing units, terminals, disk drives, tape drives, electronic memory units, printers, networking Equipment, keyboards, screens, peripherals (and other input/output devices), modems and other communication controllers, and any and all parts and appurtenances thereto, but not including all Intellectual Property used in connection with the operation of such computer Equipment, including all software and rights under any licenses related to such use, which such Intellectual Property will need to be assumed by Purchaser.

"**Contract**" any agreement, contract, obligation, promise, instrument, undertaking or other arrangements (whether written or oral) that is legally binding, including any insurance policy, license or capitalized lease to which Seller is a party.

"**Current Assets**" means the consolidated current assets of Seller's business, as determined on the basis of the same accounting principles, policies, methods and procedures, consistently applied, as those used in the Latest Balance Sheet of Seller, including (i) Accounts Receivable (net of reserves for doubtful accounts), (ii) Inventory (net of obsolete, perished or discontinued Inventory or unsalable Inventory due to deterioration), (iii) other current assets related to Seller's business, but excluding (a) cash and cash equivalents, (b) any current tax assets and (c) any assets that would be Excluded Assets if the measurement date were the Closing Date.

"**Customers**" shall mean all of the customers or prospective customers of Seller.

"**Deposit**" shall have the meaning set forth in Section 2.4(b).

"**Determined Cure Costs**" means, in the aggregate, all cure costs that have been determined pursuant to a Final Order or pursuant to an agreement between the Seller and the counterparty to the applicable Assumed Executory Contract.

"**Equipment**" means all furniture, fixtures, Computers, machinery, apparatus, appliances, implements, spare parts, signage, supplies, vehicles (including forklifts), information technology equipment (including hardware), bins, totes, tanks, tools, maintenance items and spare parts, and all other tangible personal property of every kind and description, including all related parts, procedures and manuals.

"**Email**" shall have the meaning set forth in Section 11.9.

"**Employee**" shall have the meaning set forth in Section 2.6.

"**Excluded Assets**" shall have the meaning set forth in Section 2.3.

"**Excluded Contracts**" shall have the meaning set forth in Section 2.3(d).

"**Existing Contracts**" shall mean all oral or written Contracts, agreements or understandings, including, but not limited to Seller's customer contracts, other customer contracts, real or personal property leases, subleases, arrangements, sales and purchase agreements, and purchase and sale orders to which Seller is a party.

"**Final Order**" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under F.R.C.P. 60(b)) or a petition for writ of certiorari has expired and no such appeal, motion, or petition is pending.

{02354287.DOCX;1 }

Asset Purchase Agreement - 5

"**Governmental Authority**" means any United States federal, state, or local, or any foreign, government, governmental regulatory, or administrative authority, agency or commission or any court, tribunal, or judicial or arbitral body.

"**Indebtedness**" with respect to any Person means any obligation of such Person for borrowed money, and in any event shall include without limitation (i) any obligation incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in the Assumed Liabilities, if any, (ii) the face amount of all letters of credit issued for the account of such Person, (iii) obligations (whether or not such Person has assumed or become liable for the payment of such obligation) secured by Liens, (iv) capitalized lease obligations, (v) all guarantees and similar obligations of such Person, (vi) all accrued interest, fees and charges in respect of any indebtedness and (vii) all prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any indebtedness.

"**Intellectual Property**" means any and all U.S. and foreign: (i) inventions (whether patentable or unpatentable and whether or not reduced to practice, all improvements thereto, and patents, patent applications, and patent disclosures, together with all renewals, reissuances, divisions, continuations, continuation-in-part, substitutes, extensions, and reexaminations of the foregoing, (ii) trademarks, service marks, trade dress, trade names, logos and corporate names and registrations, renewals, and applications for registration thereof together with all of the goodwill associated therewith, (iii) copyrights (registered or unregistered) and copyrightable works and registrations and applications for registration thereof, (iv) design rights (registered or unregistered) and applications for registration thereof, (v) computer software (in both source code and object code form and all commented versions thereof), whether purchased, licensed or internally developed, data, databases, and documentation thereof, (vi) all mask works and all applications, registrations and renewals in connection therewith, (vii) trade secrets, proprietary formulations, and other confidential information (including, without limitation, ideas, formulas, compositions, know how, show how, manufacturing, and production processes and techniques, research and development information and results, engineering, quality control, testing, operations, logistical, maintenance, and other technical information, drawings, diagrams, catalogs, specifications, designs, plans, proposals, technical data, copyrightable works, pricing and cost information, financial and marketing plans, business plans and proposals, customer and supplier lists, and information), quality control information, performance data, product specifications, (viii) Internet domain names and web sites, (ix) registrations and applications for any of the foregoing, and (x) copies and tangible embodiments thereof (in whatever form or medium).

"**Inventory**" means all inventory, including, but not limited to, supplies, ingredients, packaging, work-in-process, tank inventory, refrigerated products, and fresh-pack shelf-stable products, any other asset class similar to those delineated in the Latest Balance Sheet.

{02354287.DOCX;1 }

Asset Purchase Agreement - 6

"***Internal Revenue Service***" shall mean the Internal Revenue Service.

"***Latest Balance Sheet***" shall have the meaning set forth in Section 4.3.

"***Liabilities***" shall mean all liabilities and obligations (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due, whether current or non current), including, without limitation, all liabilities for Indebtedness and Taxes.

"***Lien***" or "***Liens***" means any lien (statutory or otherwise), hypothecation, encumbrance, Claim, security interest, interest, mortgage, deed of trust, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, Tax (including foreign, federal, state, and local Tax), order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any Claim based on any theory that Purchaser is a successor, transferee, or continuation of Seller, and (iv) any leasehold interest, license, or other right, in favor of a Third Party or Seller, to use any portion of the Acquired Assets, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"***Material Adverse Effect***" or "***Material Adverse Change***" shall mean any fact, condition, change, development, violation, inaccuracy, circumstance or event, individually or in the aggregate, that has been, or would reasonably be expected to be, materially adverse to the Acquired Assets, the Business, or to the ability of Seller to consummate the transactions contemplated by this Agreement, or any effect or condition which would, with the passage of time, constitute a Material Adverse Effect or Material Adverse Change.

"***Order***" means any decree, order, injunction, rule, judgment, or consent of or by any Governmental Authority.

"***Ordinary Course of Business***" shall mean the ordinary course of business of Seller consistent with past custom and practice (including with respect to quantity and frequency), taking into account the effect of the filing of the Petition and consequent limitations on Seller's Business.

"***Permit***" shall mean all licenses, permits, franchises, approvals, authorizations, consents, or orders of, or filings with, or notifications to, any Governmental Authority, whether foreign, provincial, municipal, federal, state or local, necessary for the past or present conduct or operation of Seller's Business.

"***Permitted Encumbrances***" shall have the meaning set forth in Section 4.2.

"***Person(s)***" shall mean any individual, corporation, partnership, limited liability company, trust, association, joint venture, or other entity of any kind whatsoever.

"***Petition***" has the meaning set forth in the Recitals.

"***Petition Date***" has the meaning set forth in the Recitals.

"***Products***" means all of the items prepared, processed, held, packed, made, packaged, labeled, marketed, advertise, or sold by Cascade Ag Services, Inc.

"***Purchase Price***" shall have the meaning as described in Section 2.4(a).

"***Purchase Price Allocation Schedule***" shall have the meaning set forth in Section 2.5.

"***Purchaser***" shall have the meaning as described in the Preamble herein.

"***Real Property***" shall be the real property listed on Schedule 2.1(e).

"***Representative***" shall mean any attorney, accountant, agent, independent contractor, or other representative.

"***Sale Hearing***" means the hearing of the Bankruptcy Court to approve this Agreement and the transactions contemplated by this Agreement.

"***Sale Motion***" shall mean the Debtor's request for an order approving the sale of the Debtor's assets free and clear of liens, as set forth in the Debtor's Amended Motion for Approval of Sale of Substantially all Assets Free and Clear of Liens and Assumption and Assignment of Executory Contracts and Unexpired Leases, filed by the Debtor on July 22, 2013.

"***Sale Order***" means the order of the Bankruptcy Court entered pursuant to Sections 363 and 365 of the Bankruptcy Code after proper notice to creditors and parties in interest and a hearing consistent with the Bankruptcy Code, in substantially the form attached hereto as Exhibit B, with such Sale Order (i) approving this Agreement and the transactions contemplated hereby; (ii) approving the sale of the Acquired Assets to Purchaser free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code; (iii) approving the assumption and assignment to Purchaser of the Assumed Executory Contracts pursuant to Section 365(f)(2) of the Bankruptcy Code; (iv) transferring and assigning the Assumed Executory Contracts such that the Assumed Executory Contracts will be in full force and effect from and after the Closing; (v) finding that Purchaser is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (vi) confirming that Purchaser is acquiring the Acquired Assets free and clear of all Liens and Liabilities that are not Permitted Encumbrances or Assumed Liabilities

{02354287.DOCX;1 }

Asset Purchase Agreement - 8

(defined below); (vii) providing that the provisions of Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure are waived and there will be no stay of execution of the Sale Order under Rule 62(a) of the Federal Rules of Civil Procedure; (viii) retaining jurisdiction of the Bankruptcy Court to interpret and enforce the terms and provisions of this Agreement; and (ix) authorizing the results of the Auction, if one occurs.

"***Schedules***" means the Schedules attached to this Agreement or subsequently adopted and amended from time to time by the Purchaser and Seller.

"***Seller***" shall have the meaning as described in the Preamble herein.

"***Seller's Business***" shall mean business as conducted by Seller prior to the Closing.

"***Seller Financial Statements***" shall have the meaning set forth in Section 4.15.

"***Taxes***" shall mean all taxes, duties, charges, fees, registration fees, revenue permit fees, levies, penalties or other assessments imposed by any Governmental Authority or political subdivision thereof, including income, profit, provisional, salary, estate, excise, property, sales, use, occupation, transfer, franchise, payroll, windfall or other profits, alternative minimum, gross receipts, intangibles, capital stock, estimated, employment, unemployment compensation or net worth, environmental, ad valorem, stamp, value added or gains taxes, capital duty, registration and documentation fees, custom duties, tariffs and similar charges, withholding, payroll, social security contributions or charges, disability, or other taxes (including any fee, assessment or other charge in the nature of or in lieu of any tax), including any interest, penalties or additions attributable thereto, and any liability to make payment by way of reimbursement, recharge, indemnity, damages or management charge related to taxes and regardless of whether such amounts are chargeable directly or primarily against Seller, whether disputed or not.

"***Taxing Authority***" means any Governmental Authority responsible for the administration or the imposition of any Tax.

"***Tax Return***" means any return, declaration, report, claim for refund, or information return or statement filed or required to be filed by Seller with respect to Seller's Business or the Acquired Assets, including any schedules attached thereto and including any amendment thereof.

"***Third Party***" means any Person other than Seller, Purchaser, and any of their respective Affiliates.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.1    Transfer of Assets**.    Unless set forth otherwise on the Agreement Summary on page 1 of this Agreement, upon the terms and subject to the conditions and

{02354287.DOCX;1 }

Asset Purchase Agreement - 9

provisions of this Agreement, at the Closing, Seller shall sell, convey, transfer, assign and deliver (or cause to be sold, conveyed, transferred, assigned and delivered) to Purchaser, free and clear of all Liens, other than those Liens set forth on Schedule 4.2, and Purchaser shall acquire and accept from Seller, all right, title and interest in and to all real and personal, tangible and intangible, property and assets of Seller of any kind or nature whatsoever, whether now owned or hereafter acquired by Seller, and all proceeds, rents or profits thereof, excluding only those assets specifically designated in this Agreement as Excluded Assets (collectively, the "*Acquired Assets*") including, but not limited to, all rights, title, and interest of the Seller in, to or under the following such properties and assets of Seller:

(a)     all Accounts Receivable;

(b)     all Inventory;

(c)     all Equipment;

(d)     all Assumed Executory Contracts;

(e)     all Real Property set forth on Schedule 2.1(e);

(f)     all Permits and pending applications therefore, in each case to the extent assignable;

(g)     all Intellectual Property owned by Seller (including all goodwill associated therewith or symbolized thereby) including but not limited to that set forth on Schedule 2.1(g);

(h)     all Products in development by the Sellers;

(i)     all Books and Records; provided, however, that Purchaser agrees to give Seller access to and copies of Books and Records to the extent reasonably necessary for Seller to wind up its affairs after the Closing Date;

(j)     all telephone, telex and telephone facsimile numbers and other directory listings used in connection with the Business;

(k)     all deposits (including customer deposits and security deposits for rent, electricity and otherwise) and prepaid charges and expenses of Sellers, other than any deposits or prepaid charges and expenses paid in connection with or relating exclusively to any Excluded Asset;

(l)     the capitalized leases, if any, listed or described on Schedule 2.1(l) attached hereto;

{02354287.DOCX;1 }

Asset Purchase Agreement - 10

(m)     all rights to payment of any kind due Seller including Seller's rights and claims, whether known or unknown, under existing insurance of any kind for the period after the Closing Date other than under insurance listed on Schedule 2.3(g) hereto related exclusively to an Excluded Asset or to the period before the Closing Date.  With regard to any loss, occurrence, or damage arising out of or relating to an Acquired Asset prior to the Closing Date, Acquired Assets shall include all insurance policies and claim rights necessary for Purchaser to successfully bring an insurance claim, and Seller shall take all actions necessary to perfect such rights so long as such actions do not materially denigrate Seller's insurance rights to claim any other actual known loss, occurrence, or damage to an Excluded Asset (unless Purchaser is fully willing to indemnify Seller for such material denigration).  Notwithstanding Section 11.3, this Section 2.1(m) shall be interpreted under the law most favorable to effectuate Seller's and Purchaser's intent that insurance coverage be maximized, either Delaware or Washington;

(n)     all goodwill associated with the Business or the Acquired Assets;

(o)     all other or additional privileges, rights and interests, associated with the Acquired Assets of every kind and description and wherever located that are used or intended for use in connection with, or that are necessary to the continued operation of, the Business as presently being operated; and

(p)     all Current Assets and deposit accounts of Seller related to the Business, but excluding deposit accounts related to the Blueberry Business.

Notwithstanding anything to the contrary in this Section 2.1, Seller shall have no obligation whatsoever to obtain any consent to assignment or any other permissions or authorizations to sublicense any of the Acquired Assets.  Purchaser shall be solely responsible for obtaining such consents, permissions or authorizations.

**Section 2.2     Assignment and Assumption of Liabilities**.  Notwithstanding anything to the contrary in this Agreement, Purchaser shall only assume the following Liabilities of Seller (collectively, the "***Assumed Liabilities***"):

(a)     Liabilities arising from events occurring after the Closing Date with respect to the Acquired Assets;

(b)     All obligations under the contracts listed on Schedule 2.2(b) hereto (collectively, but subject to Section 2.7 below, the "***Assumed Executory Contracts***"), including, without limitation, the Determined Cure Costs;

(c)     All Liabilities of Seller arising from transactions occurring after the Petition Date between Seller and any Third Party with whom Purchaser intends to continue to do business after the Closing Date and listed on Schedule 2.2(c), if so designated in any Bid

supplied by Seller, however, any Assumed Liability shall not operate as a credit against the Purchase Price;

(d)     All Liabilities of Seller under any and all customer programs involving Seller and Third Parties, whether such Liabilities arose before or after the Petition Date;

(e)     Seller's Rural County Sales and Use Tax Deferral Certificate No. 5594-02-261.

Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Purchaser will not assume any Liability of Seller, other than the Assumed Liabilities. This Section 2.2 shall not limit any claims or defenses Purchaser may have against any party other than Seller.  The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any Third Party against Purchaser or Seller as compared to the rights and remedies that such Third Party would have had against Seller absent the Bankruptcy Case had Purchaser not assumed such Assumed Liabilities.

**Section 2.3     Excluded Assets**.  Notwithstanding anything to the contrary in this Agreement, the following assets of Seller shall be retained by Seller and are not being sold or assigned to Purchaser by this Agreement (all of the following are referred to collectively as the "***Excluded Assets***"):

(a)     any and all assets utilized in or resulting from, or rights arising from Seller's blueberry operations in the Ordinary Course of Business (the "***Blueberry Business***");

(b)     any and all rights, claims, causes of action, including avoidance claims, arising under the Bankruptcy Code (a "***Bankruptcy Action***" and, collectively, the "***Bankruptcy Actions***");

(c)     the corporate charter, seals, minute books, stock transfer books, and other documents relating solely to the organization, maintenance, and existence of Seller as a corporation, subject to the Purchaser's right to obtain copies of all such documents as set forth herein;

(d)     all Existing Contracts that are not Assumed Executory Contracts (the "***Excluded Contracts***");

(e)     any rights of Seller under this Agreement;

(f)     all claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that Seller or Seller's bankruptcy estate may hold against any person or entity, foreign or domestic, under any law whatsoever related to an Excluded

{02354287.DOCX;1 }

Asset Purchase Agreement - 12

Asset, except claims that may exist against Purchaser or any of its principals or to the extent related to or arising under any Assumed Executory Contract;

(g)      all rights to payment of any kind due Seller prior to the Closing Date, including Seller's rights and claims, whether known or unknown, under existing insurance policy listed on Schedule 2.3(g);

(h)      all Accounts Receivable related to the Blueberry Business, if any;

(i)      all cash of Seller; and

(j)      all of Seller's rights, claims, credits, immunities, or rights of set-off against any Third Party (including former and present employees of Seller) arising out of events occurring prior to the Closing Date relating to the Acquired Assets listed on Schedule 2.3(j) hereto.

**Section 2.4      Purchase Price.**

(a)      **Purchase Price.**  Subject to any credits and/or reductions provided for in this Agreement, the "Purchase Price" for the Acquired Assets shall be paid in cash in the amount of Four Million, One Hundred Thirty-Five Thousand and No/100 Dollars ($4,135,000.00), which Purchaser shall pay to Seller at Closing.  Separate and apart from the Purchase Price and not as an element of the value of the Purchase Price, Purchaser shall also transfer ten percent (10%) of its membership units into a trust or other entity such as a limited liability company, to be formed by the Unsecured Creditors Committee for the benefit of unsecured creditors, such units to be preferred, non-voting, with certain provisions, such as buy-back rights and transfer restrictions, under terms to be determined by Purchaser.

(b)      **Deposit.**  Not later than close of business on June 27, 2013, Purchaser (or a Person on behalf of Purchaser) shall deposit $300,000.00 into either: an escrow account with an escrow agent mutually agreed to by the Parties hereto, or the Trust Account of Cairncross & Hempelmann, P.S., which Deposit will be held in such escrow account or Trust Account, as the case may be, in trust, to be treated at Closing (i) as a portion of the Purchase Price, or (ii) upon termination of this Agreement, to Seller or Purchaser, as provided by Section 10.2(d).

**Section 2.5      Allocation Schedule.**  Prior to the Closing Date, Purchaser shall prepare and deliver to Seller an allocation of the Purchase Price and the Assumed Liabilities among the Acquired Assets (the "***Purchase Price Allocation Schedule***"), which must be agreed to by Seller, in writing, prior to the Closing Date.  The Purchase Price Allocation Schedule shall be prepared in a manner required by Section 1060 of the Code and the treasury regulations promulgated thereunder.  Seller and Purchaser shall prepare and file any notice or other filings and all Tax Returns (including, without limitation, Form 8594) based on the Purchase Price Allocation Schedule and the parties shall not take any position inconsistent with the Purchase

{02354287.DOCX;1 }

Asset Purchase Agreement - 13

Price Allocation Schedule upon any examination of any Tax Return, in any refund claim or in any Tax proceeding. Notwithstanding anything in this Section 2.5 to the contrary, the Purchase Price Allocation Schedule shall in no way effect, govern or otherwise modify the Bankruptcy Court's determination of the allocation and distribution of the Seller's receipt of the Purchase Price proceeds. The final version of the Purchase Price Allocation Schedule, as approved by Seller, shall be attached hereto as Schedule 2.5.

**Section 2.6    Employee Matters**. Termination. At the close of business on the Closing Date, Seller shall terminate the employment of all persons who are employed as an employee of Seller as of the date of this Agreement (each an "***Employee***"). Purchaser shall not be obligated to hire any Employee unless an offer of employment is made to, and accepted by, such Employee. Purchaser shall have no obligation with respect to payments of salary, compensation, wages, health or similar benefits, commissions, bonuses (deferred or otherwise), severance, stock or stock options or any other sums due to any Employee that accrued before the Closing Date.

**Section 2.7    Assumed Executory Contracts; Cure Costs and Related Matters**. At the Closing and pursuant to section 365 of the Bankruptcy Code and the Sale Order, Seller shall assign to Purchaser, and Purchaser shall consent to such assignment from Seller, the Assumed Executory Contracts. To the extent any Assumed Executory Contract requires the payment of cure costs in order to be assumed pursuant to section 365 of the Bankruptcy Code, at the Closing (or as soon as reasonably practicable thereafter) the Determined Cure Costs shall be paid by Purchaser (after giving effect to the consummation of the transactions contemplated hereby; provided, however, that with respect to any cure costs that are not finally determined as of the Closing in accordance with the Sale Order, by Order of the Bankruptcy Court or by the agreement of Purchaser and the counterparty to the applicable Existing Contract, such cure costs shall be paid by Purchaser as such cure costs become Determined Cure Costs. Seller agrees that it will promptly take such actions as are reasonably necessary or desirable to obtain a Final Order of the Bankruptcy Court providing for the assumption by Seller of the Assumed Executory Contracts and the assignment to Purchaser of such Assumed Executory Contracts. Purchaser shall have the right until five (5) days prior to the Sale Hearing to, by written notice to Seller, either (i) designate any Existing Contract not already so designated to be an Assumed Executory Contract or (ii) remove any Existing Contract listed on Schedule 2.2(b) from such schedule. Any Existing Contract not listed on, or initially listed on but subsequently removed by Purchaser from Schedule 2.2(b) in accordance with this Section 2.7 shall be designated as an Excluded Contract for all purposes of this Agreement.

**ARTICLE III**
**CLOSING**

**Section 3.1    Closing**. Upon the terms and conditions set forth herein and in the Sale Order, the closing of the transactions contemplated by this Agreement (the "***Closing***") shall be held at the offices of Cairncross & Hempelmann, P.S. at 10:00 a.m. Pacific time 10 days after the Court enters an order approving this Agreement, but in no event later than 5:00 p.m. on August

{02354287.DOCX;1 }

Asset Purchase Agreement - 14

30, 2013, provided that (a) the Closing shall not occur unless the conditions set forth in Articles VII and VIII are satisfied or waived by Purchaser and Seller, as applicable. Notwithstanding the foregoing, the Closing may be held at such other time and place as is mutually agreeable to the parties.  The date on which the Closing occurs shall be the "***Closing Date***."

      **Section 3.2**     **Actions at Closing**.  At the Closing, Seller and Purchaser shall deliver and do (or cause to be delivered and done) the following:

      **(a)**     **Instruments and Possession**.  Seller shall deliver to Purchaser:

      (i)     one or more bills of sale executed by Seller, conveying the tangible personal property included in the Acquired Assets;

      (ii)     Certificates of Title for any and all vehicles included in the Acquired Assets;

      (iii)     a copy of the Sale Order;

      (iv)     a special warranty deed (or the equivalent) executed by Seller in the customary form for the jurisdiction in which the Real Property is located, conveying the Real Property;

      (v)     an executed real estate excise tax affidavit;

      (vi)     an executed counterpart of an affidavit by Seller stating that Seller is not a "foreign person" as defined in the Federal Foreign Investment in Real Property Tax Act of 1980 and the 1984 Tax Reform Act in the form of Exhibit C attached hereto; and

      (vii)     such other documents as Purchaser may reasonably request.

      **(b)**     **Payment**.  At Closing, (i) Purchaser and Seller shall cause the Deposit to be released to Seller, (ii) Purchaser shall pay the balance of the Purchase Price, reduced by the Deposit, by wire transfer in immediately available funds to the account that Seller designates in writing to Purchaser not less than one (1) Business Day prior to Closing, and (iii) Purchaser shall deliver such other documents as Seller may reasonably request.

      **(c)**     **Form of Instruments**.  To the extent that a form of any document to be delivered hereunder is not attached as an Exhibit hereto, such documents shall be in form and substance, and shall be executed and delivered in a manner, reasonably satisfactory to Purchaser and Seller.

{02354287.DOCX;1 }

Asset Purchase Agreement - 15

**Section 3.3    Transaction Expenses**.  Except as expressly provided by this Agreement, (including with respect to the Break-Up Fee payable by Seller in accordance with Article X), each party to this Agreement shall bear its own costs and expenses, including attorney, accountant, and other independent contractor fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby; provided, however, that if Purchaser is not the successful bidder, Purchaser is entitled to submit to Bankruptcy Court for approval, after notice and hearing, a request for its due diligence expenses.

**Section 3.4    Pro-rations**.

(a)    **Personal Property Taxes; Motor Vehicle Licenses and Registration Real Property and Similar Taxes**.  Any personal property taxes and motor vehicle license / registration fees associated with the Acquired Assets that are imposed on a periodic basis and are payable for a tax period that includes (but does not end on) the Closing Date, and any real property taxes or assessments required to be paid by Seller with respect to the Acquired Assets, shall be prorated as of the Closing Date as follows: Seller shall bear the proportion of such taxes equal to a fraction, the numerator of which is equal to the number of days which shall have elapsed from the beginning of the applicable tax period through the Closing Date, and the denominator of which is the number of days in the entire applicable tax period, and Purchaser shall be responsible for the remainder.

(b)    **Transfer Taxes**.  Purchaser shall pay any and all transfer, documentary, sales, use, retail, excise, stamp, value added, registration, recording, conveyance, property, transfer, and gains Taxes, and any similar Taxes, levies, charges and fees (including any penalties and interest thereon) in connection with the sale of the Acquired Assets hereunder.  The amount of the foregoing shall be in addition to the Purchase Price and shall be payable by Purchaser to the appropriate Taxing Authorities at Closing.

(c)    **Tax Responsibility**.  Unless otherwise provided to the contrary herein, Purchaser shall be solely responsible for Taxes relating to the Acquired Assets applicable to or arising from the period after the Closing Date, and Seller shall be solely responsible for Taxes relating to Acquired Assets applicable to or arising on or prior to the Closing Date.

(d)    **Pro-rations Generally**.

(i)    Any and all other payments, receipts, rentals, costs, charges, fees, or expenses connected with or used in the operation of the Acquired Assets, including costs under the Assumed Executory Contracts or revenues from the Acquired Assets, shall be prorated between Purchaser and Seller prior to the Closing Date and Seller shall bear the proportion thereof through the day prior to the Closing Date.

{02354287.DOCX;1 }

Asset Purchase Agreement - 16

(ii)     If any of the items described above cannot be finally apportioned at Closing because of the unavailability of the amounts that are to be apportioned or otherwise, or are incorrectly apportioned at Closing or subsequent thereto, such items shall be apportioned or reapportioned, as the case may be, as soon as practicable after Closing or the date such error is discovered or the event giving rise to an apportionment or reapportionment occurs, as applicable. For purposes of calculating pro-rations, Seller shall be deemed to have title to the Acquired Assets up to, but not including, the Closing Date.  All such pro-rations shall be made on the basis of the actual number of days of the year and month that shall have elapsed as of the Closing Date.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Purchaser to enter into this Agreement, Seller represents and warrants to Purchaser that, as of the date hereof and as of Closing:

**Section 4.1     Organization and Authorization**.  Seller is informed that Cascade Ag Services, Inc. is a corporation validly existing under the laws of the State of Washington and is duly qualified and in good standing as a foreign corporation in all jurisdictions in which it conducts Business.  Subject to the entry of the Sale Order, (i) this Agreement has been duly executed and delivered by Seller and is a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms (except to the extent that enforcement may be affected by applicable bankruptcy, reorganization, insolvency, and similar laws affecting creditors' rights and remedies, and by general principles of equity (regardless of whether enforcement is sought at law or in equity)), and (ii) each agreement or instrument that has been or shall be entered into or executed and delivered by Seller, pursuant to his Court ordered authority,  in connection with the transactions contemplated by this Agreement has been (or will be) duly authorized, executed, and delivered by Seller, and is (or will be when authorized, executed, and delivered) a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency, and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)).

**Section 4.2     Title to Assets**.  Subject to the entry and terms of, and in accordance with, the Sale Order, this Agreement and the documents contemplated hereby, when duly executed and delivered by Seller to Purchaser at the Closing, will effectively vest in Purchaser title to, or, in the case of property leased or licensed by Seller, a leasehold or licensed interest in, all of the Acquired Assets, free and clear of all Liens, except for the permitted encumbrances set forth on Schedule 4.2 (the "***Permitted Encumbrances***"), and the Assumed Liabilities.

**Section 4.3     Financial Statements**.  Set forth on Schedule 4.3 attached hereto are copies of: (a) Seller's unaudited balance sheet as of March 31, 2013 (the "***Latest Balance Sheet***") and the related statement of income for the three-month period then ended and

{02354287.DOCX;1 }

Asset Purchase Agreement - 17

(b) Seller's unaudited balance sheet, statement of income and cash flows for the fiscal year ended 2012 (collectively, the "*Seller Financial Statements*"). Purchaser has public access to Seller's Financial Statements filed with the Bankruptcy Court.

**Section 4.4    Ownership.**  Seller is informed that Craig Staffanson and Ben T. Lee are the sole equity holders of Seller.

**Section 4.5    "As Is, Where Is".**  Except as expressly set forth herein, the Acquired Assets are sold "As Is," "Where Is," and Purchaser agrees to take all of the Acquired Assets "As-Is," "Where-Is," and with all faults and conditions thereon.  Except for the representations and warranties set forth in this Article IV, Seller has not made or implied, and does not make or imply, any other representation or warranty, including, without limitation, a warranty of fitness for a particular purpose, a warranty of merchantability, warranties of maintenance, repair, condition, design or marketability or otherwise.

**ARTICLE V.**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

As an inducement to Seller to enter into this Agreement, Purchaser represents and warrant to Seller that:

**Section 5.1    Organization.**  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Washington.

**Section 5.2    Authorization.**  Purchaser has all necessary power and authority to enter into this Agreement and has taken all company action necessary to execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement, and to perform its obligations under this Agreement, and no other corporate proceedings on the part of Purchaser are necessary to authorize the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.  This Agreement has been duly executed and delivered by Purchaser and is a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms (except to the extent that enforcement may be affected by applicable bankruptcy, reorganization, insolvency, and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)).  Each agreement or instrument that has been or shall be entered into or executed and delivered by Purchaser in connection with the transactions contemplated by this Agreement has been (or will be) duly authorized, executed, and delivered by Purchaser, and is (or will be when authorized, executed, and delivered) a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)).

{02354287.DOCX;1 }

Asset Purchase Agreement - 18

**Section 5.3    Governmental Consents and Approvals**.  To Purchaser's knowledge, other than the Sale Order, no consent, waiver, agreement, approval, permit, or authorization of, or declaration, filing, notice, or registration to or with, any United States federal or state governmental or regulatory authority is required to be made or obtained by Purchaser in connection with the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.

**Section 5.4    No Violation**.  The execution and delivery of this Agreement and the other agreements specified herein and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of the organizational documents of Purchaser or (ii) conflict with or violate any statute or law, or any judgment, decree, order, regulation, or rule of any court or Governmental Authority, binding upon or applicable to Purchaser or by which the property or assets of Purchaser are bound or affected.

**Section 5.5    Independent Review.**  Purchaser acknowledges and represents that, except to the extent of any misrepresentations by the Seller,  it (i) relied solely upon its own independent review, investigation, and/or inspection of any documents and/or all or any portion of the Debtor's assets in connection with this Agreement; and (ii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding all or any portion of the Debtor's assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated herein.

**ARTICLE VI.**
**ADDITIONAL COVENANTS**

**Section 6.1    Conduct of Seller's Business**.  From the date of this Agreement, and subject to certain consent rights of Purchaser as set forth in this Agreement, and subject to the Bankruptcy Court-defined limited authority of Seller as to Cascade Ag Services, Inc., Seller shall use its commercially reasonable efforts to carry on Cascade Ag Services, Inc.'s Business in the Ordinary Course of Business.

**Section 6.2    Access to Information and Facilities; Communication with Parties to Existing Contracts**.

(a)    During Seller's normal business hours, Seller shall allow Purchaser and its Representatives to make such inspection of the Acquired Assets, to inspect and make copies of Contracts, Books and Records, and all other documents and information reasonably requested by Purchaser and related to the Acquired Assets or Seller's Business, and to communicate with and otherwise access the Employees, upon reasonable advance notice, but in no event less than two (2) days' advance notice. Upon Seller's written consent, Purchaser may communicate with all Customers, suppliers, lessors, lenders, vendors and other parties to Existing Contracts with Seller for the purpose of renegotiating Existing Contracts or establishing new agreements with such

parties to be effective upon Closing. On the date of execution of this Agreement, an initial set of Schedules shall be attached, and Purchaser acknowledges that the initial Schedules will be subsequently amended and restated by Seller prior to the Closing Date, and this Agreement shall automatically be amended to add the amended and restated Schedules to this Agreement. Purchaser shall have a right to review and comment on the amended and restated Schedules before they become final. Upon Seller's delivery of the amended and restated Schedules to Purchaser, the representations and warranties of Seller set forth in Article IV shall be deemed to be true and correct as of the date of the amended and restated Schedules for all purposes of this Agreement.

(b)     Possession of the Real Property shall be delivered to Purchaser on the Closing Date, provided, however, that prior to the Closing Date Seller shall afford authorized Representatives of Purchaser reasonable access to the Real Property for purposes of satisfying Purchaser with respect to the representations, warranties and covenants of Seller contained herein.

**Section 6.3     Further Assurances.** Seller shall execute such documents and use its reasonable best efforts to take or cause to be taken all actions and do or cause to be done all things necessary, proper, or advisable to consummate the transactions contemplated by this Agreement; provided, however, that the foregoing shall not require Seller to make any payments to any party after the Closing Date, except as expressly provided in this Agreement. Seller shall use commercially reasonable efforts to fulfill or obtain the fulfillment of the conditions set forth in Article VII of this Agreement. The obligations of Seller set forth in the first sentence of this Section 6.3 shall survive the Closing.

**Section 6.4     Bankruptcy Actions.**

(a)     Unless otherwise agreed to in writing by the parties, no later than August 9, 2013, the Bankruptcy Court shall have entered the Sale Order; provided, however, that to the extent the Bankruptcy Court is unable to enter the Sale Order on or prior to such date, the Sale Order shall be entered on the earliest available date thereafter.

(b)     Seller will make reasonable efforts to provide Purchaser with an opportunity to review and comment upon all motions, applications and supporting papers prepared by Seller (including forms of orders and notices to interested parties) prior to the filing thereof in the Bankruptcy Cases with respect to the transactions contemplated hereby.

**Section 6.5     Other Bids.** Purchaser acknowledges that Seller will be entitled to solicit offers or bids from other prospective purchasers (each, a "***Bidder***") for the sale of all or substantially all of the Acquired Assets in accordance with the procedures set forth in the Bidding Procedures Order or other order of the Bankruptcy Court.

{02354287.DOCX;1 }

Asset Purchase Agreement - 20

**Section 6.6    Continued Effectiveness of Representations and Warranties through the Closing Date**.  From the date hereof through the Closing Date, except as otherwise expressly contemplated by this Agreement, Seller and Purchaser shall use commercially reasonable efforts to cause the representations and warranties made in this Agreement to continue to be true and correct in all material respects on and as of the Closing Date as if made on and as of the Closing Date.  Seller shall promptly notify Purchaser if it becomes aware, and Purchaser shall promptly notify Seller if it becomes aware, of any event, condition, or circumstance occurring from the date hereof through the Closing Date that would constitute a material violation or breach of any of the respective representations or warranties made by Seller or Purchaser contained in this Agreement if made on such date.  For the avoidance of doubt, this Section 6.6 does not authorize either Seller or Purchaser to amend this Agreement (such as to revise any representation) other than pursuant to Section 11.4.

**Section 6.7    Public Announcements**.  Except as otherwise required by law or as advised by counsel, Seller and Purchaser will consult with each other and cooperate with respect to the text and substance of any press release or any other public statement relating to, connected with, or arising out of this Agreement or the transactions contemplated by this Agreement.

**Section 6.8    Confidentiality**.

(a)    Subject to the requirements of the Bankruptcy Code, or as may be imposed by the Bankruptcy Court, from and after the Closing: (i) Seller shall, and shall cause any Affiliate to, hold in confidence all confidential information (including trade secrets, customer lists, marketing plans and pricing information) transferred to Purchaser; (ii) in the event that Seller or an Affiliate shall be legally compelled to disclose any such information, Seller shall provide Purchaser with prompt written notice of such requirement so that Purchaser may seek a protective order or other remedy; and (iii) in the event that such protective order or other remedy is not obtained, Seller or their Affiliates shall furnish only such information as is legally required to be provided.

(b)    Purchaser acknowledges executing a confidentiality and non-disclosure agreement, the terms of which remain in full force and effect and shall survive the execution of this Agreement.

**Section 6.9    Sales Agent.**  Purchaser covenants and agrees to hold harmless Red to Black Advisors, LLC, (the "**Sales Agent**") and any of the Sales Agent's agents, contractors, and employees, from any and all damages arising out of or related to this Agreement, the sale of the Seller's assets, and/or the procedures established by the Court in the Bidding Procedures Order.

## ARTICLE VII.
## CONDITIONS TO SELLER'S OBLIGATIONS

The obligation of Seller to sell the Acquired Assets and to consummate the transactions contemplated hereby are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived (in whole or in part) by Seller in accordance with Section 11.4 herein.

**Section 7.1     Representations and Warranties**.  The representations and warranties of Purchaser contained in Article V hereof shall be true and correct in all respects, in each case as of the Closing Date, as though made on such date (except that any representations and warranties referencing a specific date need be true and correct only as of such date).

**Section 7.2     Covenants and Agreements**.  Purchaser shall have performed in all material respects all of the covenants, agreements, and conditions Purchaser is required by this Agreement to perform, satisfy, and comply with by Purchaser at or prior to Closing.

**Section 7.3     Bankruptcy Conditions**. The Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to any applicable stay.

**Section 7.4     Deliveries**.  On or prior to the Closing Date, Purchaser shall have delivered to Seller all of the following:

(a)     a certificate from Purchaser in a form reasonably satisfactory to Seller, dated as of the Closing Date, stating that the conditions specified in Section 7.1 and Section 7.2 have been satisfied;

(b)     copies of the resolutions of Purchaser's officers, managers, and/or members, as applicable, approving the transactions contemplated by this Agreement; and

(c)     the Purchase Price in accordance with Section 3.2(b) hereof.

## ARTICLE VIII.
## CONDITIONS TO PURCHASER'S OBLIGATIONS

The obligations of Purchaser to purchase the Acquired Assets and to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived (in whole or in part) by Purchaser in accordance with Section 11.4 herein:

**Section 8.1     Representations and Warranties**.  The representations and warranties of Seller contained in Article IV shall be true and correct, in each case as of the Closing Date, as

though made on such date (except that representations and warranties that reference a specific date need be true and correct only as of such date), except where the failure of such representation and warranty to be so true and correct has not had and would not reasonably be expected to have a Material Adverse Effect.

**Section 8.2** **Covenants and Agreements**. Seller shall have performed in all material respects all of the covenants, agreements, and conditions Seller is required by this Agreement to perform, satisfy and comply with at or prior to Closing.

**Section 8.3** **Bankruptcy Condition**.

(a) The Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to any applicable stay.

**Section 8.4** **Litigation**. No action, suit, or other proceeding shall be pending before any Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain damages in respect thereof, or involving a claim that consummation thereof would result in the material violation of any law, decree, or regulation of any Governmental Authority having appropriate jurisdiction.

**Section 8.5** **Deliveries**. On or prior to the Closing Date, Seller shall have delivered to Purchaser (a) a certificate in a form reasonably satisfactory to Purchaser, dated as of the Closing Date, stating that the conditions specified in Section 8.1 and Section 8.2 have been satisfied as of Closing; and (b) the documents and instruments called for in Section 3.2(a) hereof.

# ARTICLE IX.
# TIMING OF CLOSING

**Section 9.1** **Timing of Closing**. The Closing Date shall be no later than 5:00 p.m. on August 30, 2013.

# ARTICLE X.
# TERMINATION; TERMINATION PAYMENT

**Section 10.1** **Termination**. This Agreement may be terminated prior to the Closing:

(a) At any time by mutual written consent executed by both Purchaser and Seller;

(b) By Purchaser in the event of (i) the failure of any condition to closing set forth in Article VIII, or (ii) the entry by the Bankruptcy Court of an order denying Seller's motion to approve the Sale Order;

{02354287.DOCX;1 }

Asset Purchase Agreement - 23

**(c)** By Purchaser if Seller withdraws or seeks authority to withdraw any Sale Motion on file;

**(d)** By Seller in the event of the failure of any condition to closing set forth in Article VII or;

**(e)** By Seller for any reason contemplated by the Bidding Procedures Order, including, without limitation, the closing of an Alternative Transaction; or upon Purchaser's noncompliance with any provision of the Bidding Procedures Order;

**(f)** By Seller if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or a trustee is appointed for Seller in the Bankruptcy Case and such Trustee rejects the transaction contemplated by this Agreement;

**Section 10.2   Remedies**.  In the event of termination of this Agreement pursuant to Section 10.1:

**(a)** each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated by this Agreement that contain confidential information, whether obtained before or after the execution hereof, to the party furnishing the same;

**(b)** no confidential information received by any party with respect to the business of any other party or its Affiliates shall be disclosed to any Third Party, unless required by law;

**(c)** all obligations of the parties hereto under this Agreement shall terminate and there shall be no liability of any party hereto to any other party, other than Purchaser's obligation under that certain Confidentiality Agreement, dated June 12, 2013, which shall survive any termination of this Agreement, and, except for Purchaser's obligation for liquidated damages provided in Section 10.2(d) and the Break-Up Fee as discussed herein, each party hereto shall bear its own expenses incurred in connection with the negotiation, preparation, execution, and performance of this Agreement; and

**(d)** If the termination is by Seller due to Purchaser's failure to close the transactions contemplated by this Agreement without justification and in breach of this Agreement, Seller's sole remedy shall be to ask the Bankruptcy Court for an order instructing the holder of the Deposit to pay Seller the Deposit as liquidated damages on account of Purchaser's breach, with all parties hereby acknowledging that the amount of the Deposit is a reasonable estimate of the damages (and not a penalty) that may be caused Seller on account of such breach (the precise measure of which would otherwise be impossible); otherwise, the Deposit shall be

{02354287.DOCX;1 }

Asset Purchase Agreement - 24

returned Purchaser, if such Deposit has not already been paid in accordance with the terms of this Agreement.

Section 10.3   Effect of Termination or Breach.  If the transactions contemplated by this Agreement are not consummated, this Agreement shall become null and void and of no further force and effect, except for the obligations of the Parties that expressly survive Closing or termination of this Agreement and as contained in this Section 10.3 and in Section 10.2(d), as applicable.

Section 10.4   Survival of Representations and Warranties.  All representations and warranties of Seller set forth in Article IV of this Agreement shall terminate on the Closing Date and shall be of no further force and effect.

Section 10.5   Approved Break-Up Fee.  If the termination of this Agreement is by the Seller  pursuant to Section 10.1(e) of this Agreement due to the Bankruptcy Court approving a sale of all or part of the Acquired Assets by sale to a Bidder(s) other than the Purchaser, the Seller shall pay the Purchaser in cash, at the closing of such transaction(s) and prior to disbursement of the Seller's funds to any third party including secured creditors, the Purchaser's reasonable and actual expenses, as determined by the Bankruptcy Court, incurred solely in connection with this transaction up to $100,000.00 ("***Break-Up Fee***"), which shall constitute an administrative expense of the Seller's bankruptcy estate pursuant to 11 U.S.C. § 503(b).

# ARTICLE XI.
# MISCELLANEOUS

Section 11.1   Assignment; Successors.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by any party without the prior written consent of the other; provided, however, (i) Purchaser may assign some or all of its rights under this Agreement to any Affiliate of Purchaser without consent, so long as Purchaser remains liable for its obligations, and (ii) Purchaser may assign its rights under this Agreement as collateral security to any lender providing Purchaser with acquisition financing.   Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective representatives, heirs, legatees, successors, and permitted assigns, including, without limitation, any Chapter 11 trustee appointed in the Bankruptcy Case, and no other person shall have any right, benefit or obligation hereunder.

Section 11.2   Notices.  All notices, requests, demands and other communications that are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given (a) when received, if personally delivered, (b) when transmitted, if transmitted by Email, (c) the date after such notice is sent, if sent for next-day delivery to a domestic address by a recognized and reputable overnight delivery service (*e.g.*, Federal

Express), and (d) upon receipt, if sent by certified or registered mail, return receipt requested. Notices, demands, and communications to Seller and Purchaser shall be sent as indicated below:

If to Purchaser:        TRIAK Holdings, LLC
        C/O Andrew Anderson
        1730 Aimco Blvd.
        Mississauga, L4W1V1
        Ontario, CANADA
        Emails: AAnderson@Whytes.ca; BKawaja@Whytes.ca

With copies to:        Diana K. Carey, Esq.
        Karr Tuttle Campbell
        701 Fifth Avenue, Suite 3300
        Seattle, WA 98101
        (206 682-7100) (fax)
        Email: dcarey@karrtuttle.com

If to Seller:        Cascade Ag Services, Inc.
        Attn: Leo Rosenberger
        Red2Black Associates, LLC
        4822 226th ST SW
        Mountlake Terrace, WA 98043
        Email: rosenbergerl@yahoo.com

With copies to:        Cairncross & Hempelmann PS
        Attn:  John Rizzardi
        524 Second Ave., Ste. 500
        Seattle, WA 98104
        Email: jrizzardi@cairncross.com

or to such other place and with such other copies as any party may designate by written notice to the others.

**Section 11.3   Choice of Law; Submission to Jurisdiction**.  This Agreement shall be construed and interpreted, and the rights of the parties determined in accordance with, the laws of the State of Washington, without giving effect to Washington's principles on conflict of laws. Each party irrevocably consents to the service of any and all process in any action or proceeding arising out of or relating to this Agreement by the mailing of copies of such process to each party at its address specified in Section 11.2.  The parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of

{02354287.DOCX;1 }

Asset Purchase Agreement - 26

the transactions contemplated hereby or thereby and any such dispute shall be deemed to have arisen in the State of Washington. Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith.

**Section 11.4 Entire Agreement; Amendments and Waivers**.   This Agreement, together with all Exhibits and Schedules attached or to be attached hereto, constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the parties with regard to the subject matter hereof.  All amendments of this Agreement will only be effective if executed in writing by or on behalf of all parties.  No waiver of any of the provisions of this Agreement shall be effective unless made in a writing by the party making the waiver or be deemed or constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

**Section 11.5   Construction**.   The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and shall not be deemed in any manner to modify, explain, expand, or restrict any of the provisions of this Agreement.  Unless stated to the contrary, all references to Articles, Sections, paragraphs, or clauses herein shall be to the specified Article, Section, paragraph or clause of this Agreement, and all references to Exhibits and Schedules shall be to the specified Exhibits and Schedules attached hereto.  All Exhibits and Schedules attached are made a part hereof.  All terms defined herein shall have the same meaning in the Exhibits and Schedules, except as otherwise provided therein.  All references in this Agreement to "this Agreement" shall be deemed to include the Exhibits and Schedules attached hereto.  The terms "hereby," "hereto," "hereunder," and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used.  Whenever in this Agreement provision is made for the payment of attorneys' fees, such provision shall be deemed to mean reasonable attorneys' fees and paralegals' fees.  The term "including" when used herein shall mean "including, without limitation."  Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.

**Section 11.6   Third Party Beneficiaries**.  No Person other than the parties hereto, shall have any rights or claims under this Agreement.

**Section 11.7   No Waiver**.  The failure of any party hereto to seek redress for any breach, or to insist upon the strict performance, of any covenant or condition of this Agreement by the other shall not be, or be deemed to be, a waiver of the breach or failure to perform, nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms hereof from constituting a default hereunder.

{02354287.DOCX;1 }

Asset Purchase Agreement - 27

**Section 11.8   Multiple Counterparts/Signatures**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

**Section 11.9   Delivery by Email**.  This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by electronic mail ("***Email***"), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument shall raise the use of Email to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Email as a defense to the enforceability of a contract, and each party forever waives any such defense.

**Section 11.10 Invalidity**.  In the event that any one or more of the provisions, or any portion thereof, contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality, or unenforceability shall not affect any other provision, or any portion thereof, of this Agreement or any other such instrument.

**Section 11.11 Further Assurances**.  Without limiting any other rights or obligations of the parties contained in this Agreement, following the Closing, each party agrees to execute, or cause to be executed, such documents, instruments, or conveyances and take such actions as may be reasonably requested by the other party to effectuate the purposes of this Agreement, including, without limitation, such instruments as shall be reasonably requested by Purchaser to vest in Purchaser title in and to the Acquired Assets in accordance with the provisions of this Agreement.

**Section 11.12 Cumulative Remedies**.  All rights and remedies of any party hereto are cumulative of each other and of every other right or remedy such party may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

**Section 11.13 Currency**.  Except as otherwise expressly provided in this Agreement, all dollar amounts are stated in United States dollars.

**Section 11.14 Representation by Counsel; Mutual Negotiation**.  Each party has been represented by counsel of its choice in negotiating this Agreement.  This Agreement shall therefore be deemed to have been negotiated and prepared at the joint request, direction, and

construction of the parties, at arm's length, with the advice and participation of counsel, and will be interpreted in accordance with its terms without favor to any party.

**Section 11.15 Consents to Assignment**.   Anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Assumed Executory Contract or any claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, without the consent of a Third Party thereto, would constitute a breach thereof or in any way adversely affect the rights of Purchaser thereunder after taking into account the operation of the Bankruptcy Code.

**Section 11.16 Post-Closing Dispute Resolution**.   Any party may submit to the Bankruptcy Court any controversy, claim or dispute of whatever nature between the parties arising out of or relating to this Agreement after the Closing that is not resolved within thirty (30) days after written notice by one party to the other of such controversy, claim or dispute. The parties agree that the Bankruptcy Court shall have exclusive jurisdiction to resolve such controversy, claim or dispute; provided, however, that upon the entry of a final decree in the Bankruptcy Case, all disputes arising out of or relating to this Agreement (except as otherwise provided herein) shall be brought in a state or federal court located in either King County, for state court matters, or the Western District of Washington, for federal court matters.   The Bankruptcy Court shall award a party that prevails in full its reasonable attorneys' fees and costs and shall award a party that prevails less than in full that portion of its reasonable attorneys' fees and costs as determined by the Bankruptcy Court.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed by their respective duly authorized representatives as of the day and year first above written.

**SELLER:**

Cascade Ag Services, Inc.

By Red to Black Advisors, LLC
Its Court-Appointed Sales Agent

By: _____

     Leo Rosenberger, its Managing Director

**PURCHASER:**

Pleasant Valley Farms, LLC

By: _____

     Beth Kawaja

Its:    Manager

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed by their respective duly authorized representatives as of the day and year first above written.

**SELLER:**

Cascade Ag Services, Inc.

By Red to Black Advisors, LLC
Its Court-Appointed Sales Agent

By: _____
              Leo Rosenberger, its Managing Director

**PURCHASER:**

Pleasant Valley Farms, LLC

By: _____
              Beth Kawaja
Its:    Manager

{02354287.DOCX;1 }

Asset Purchase Agreement - 30

#903797 v1 / 45616-001

**Exhibit A**

## List of Attached Schedules

Schedule 2.1(e) – Real Property

Schedule 2.1(g) – Intellectual Property

Schedule 2.1(l) – Capitalized Leases

Schedule 2.1(m) – Acquired Bankruptcy Actions  [DELETED]

Schedule 2.2(b) – Assumed Executory Contracts and Unexpired Leases

Schedule 2.2(c) – Post-Petition Liabilities

Schedule 2.3(g) – Insurance Policies Related to Excluded Assets

Schedule 2.3(j) – Claims Against Third Parties

Schedule 2.5 – Purchase Price Allocation Schedule

Schedule 4.2 – Permitted Encumbrances

Schedule 4.3 – Financial Statements

Schedule 2.1(e) – Real Property

**The Real Property consists of the following:**

<u>PARCEL "A":</u>

Lot 3 of Short Plat No. 96-092 approved September 12, 1997, and recorded September 24, 1997, under Auditor's File No. 9709240084 filed in Volume 13 of Short Plats, pages 41 and 42, records of Skagit County, Washington, being a portion of the Northwest ¼ of the Southeast ¼, Section 5, Township 33 North, Range 3 East W.M.

Situate in the County of Skagit, State of Washington.

<u>PARCEL "B":</u>

Lot 4 of Short Plat No. 96-092 approved September 12, 1997, and recorded September 24, 1997, under Auditor's File No. 9709240084 filed in Volume 13 of Short Plats, pages 41 and 42, records of Skagit County, Washington, being a portion of the Northwest ¼ of the Southeast ¼, Section 5, Township 33 North, Range 3 East W.M.

Situate in the County of Skagit, State of Washington.

Schedule 2.1(g) – Intellectual Property

**BRANDS (LABELS)**

TRADEMARK REGISTRATIONS WITH THE STATE OF WASHINGTON:

- PLEASANT VALLEY FARMS
- SUNRISE FARMS
- CHEF'S DELIGHT
- CASCADE ACRES – NATURALS

**REGISTRATIONS**

- FDA FOOD PROCESSOR'S LICENSE – STATE OF WASHINGTON – WSDA

**CERTIFICATIONS**

- KOSHER CERTIFIED BY THE ORTHODOX UNION
- ORGANIC FOOD PROCESSOR – WSDA
- ORGANIC FOOD PRODUCER – WSDA

**THIRD PARTY AUDIT**

- STERITECH CERTIFICATE OF CONFORMITY

**BUSINESS LICENSES**

- EACH LEGAL ENTITY WITH STATE OF WASHINGTON or LOCAL AGENCIES

**DOMAIN NAMES**

- PleasantValley-Farms.com

PRODUCT RECIPES, FORMULAS, BRAND NAMES

Schedule 2.1(l) - Capitalized Leases

| | Agreement Name | Description | Counterparty |
|---|---|---|---|
| 1. | Forklift Lease | To be paid in full prior to Closing (at which time the forklift will be "Equipment" as that term is defined in the Asset Purchase Agreement) | Yale/NMHG/Case |
| 2. | Forklift Lease | To be paid in full prior to Closing (at which time the forklift will be "Equipment" as that term is defined in the Asset Purchase Agreement) | Yale/NMHG/Case |

3. Additional capitalized leases, if any, to be determined by Purchaser.

Schedule 2.1(m) – Acquired Bankruptcy Actions  [DELETED]

Schedule 2.2(b) – Assumed Executory Contracts and Unexpired Leases

| Agreement Name | Description | Counterparty |
|---|---|---|
| 1. Mesman Field | Field Lease – oral, paid semi-annually | Arlene Mesman |
| 2. Nystrom Field | Field Lease – oral, paid semi-annually | Doreen Nystrom |

3.  Additional contracts, if any, to be determined by Purchaser.

Schedule 2.2(c) – Post-Petition Liabilities

NONE

Schedule 2.3(g) – Insurance Policies Related to Excluded Assets

[TO BE DETERMINED BY PURCHASER]

Schedule 2.3(j) – Claims Against Third Parties

[TO BE DETERMINED BY PURCHASER]

Schedule 2.5 – Purchase Price Allocation Schedule

**SCHEDULE 2.5**
**ALLOCATION OF PURCHASE PRICE AND ASSUMED LIABILITIES[1]**

| Purchase Price Allocation | | Amount |
|---|---|---|
| Class I | Cash | Net Book Value at Closing |
| Class II | Securities | Net Book Value at Closing |
| Class III | Accounts Receivable | Subject to due diligence – to be based on Net Book Value AR minus allowance for aging and uncertainty of collection |
| Class IV | Inventory | Subject to due diligence – to be based on Net Book Value of inventory minus allowance for slow-moving or unsaleable product |
| Class V | Property, plant and equipment, and other assets | Subject to due diligence – to be based on all relevant factors, including appraisals, tax basis and Net Book Value |
| Class VI and VII | IRC 197 Intangibles & Goodwill | Balance of Purchase Price and Assumed Liabilities |

For purposes of the above allocation, the determination of Net Book Value at Closing shall be determined on the basis of the same accounting principles, policies, methods and procedures, consistently applied, as those used in the Latest Balance Sheet of Seller.

---

[1] Allocation Schedule subject to advice from Buyer's accountants and further due diligence.

#903313 v1 / 45616-001

**Exhibit A**

Schedule 4.2 – Permitted Encumbrances


Other than the Real Property Permitted Encumbrances set forth below, there are no Permitted Encumbrances.


2. The lands described herein have been classified as farm and agricultural as disclosed by notice recorded November 21, 1972, under Auditor's File No. 777091, and are subject to the provisions of RCW 84.34 which include the requirement of a continuation of restricted use in order to continue the present assessment rate. A change in use can cause an increased assessment rate for present and past years. Any sale or transfer of all or a portion of said property requires execution of a notice of compliance form attached to the excise tax affidavit.

NOTICE OF CONTINUATION:

Recorded:                    May 12, 2004 and July 5, 2007
Auditor's No.:               200405120102 and 200707050074

Schedule 4.3 – Financial Statements

**Pleasant Valley Farms (Consolidated)**
**Balance Sheet**
**2012**

| | Jan-12 | Feb-12 | Mar-12 | Apr-12 | May-12 | Jun-12 | Jul-12 | Aug-12 | Sep-12 | Oct-12 | Nov-12 | Dec-12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CURRENT ASSETS** | | | | | | | | | | | | |
| Cash on Hand and in Banks | 20,598 | 58,801 | 65,180 | 98,878 | 106,793 | 74,489 | 32 | 38,463 | (1,733) | 132,187 | 63,464 | 124,864 |
| Accounts Receivable | 1,043,286 | 1,073,182 | 1,172,606 | 1,238,623 | 1,249,290 | 1,307,190 | 1,243,100 | 1,383,396 | 1,222,406 | 1,210,169 | 896,865 | 821,135 |
| Intercompany Receivable PVF | - | - | - | - | - | - | - | - | - | - | - | - |
| Intercompany Receivable-SH | - | - | - | - | - | - | - | - | - | - | - | - |
| Intercompany Receivable-MVP | 42,200 | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | |
| Inventory | | | | | | | | | | | | |
| Blueberry Costs Incurred | | | | | | | | | | | | |
| Harvest Costs Incurred | | | | | | | | | | | | |
| Investment in Growing Crops | | | | | | | | | | | | |
| 1601 - Pleasant Valley Farms | | | | | | | | | | | | |
| 1602 - Mountain View Produce | | | | | | | | | | | | |
| Pleasant Valley Farms | | | | | | | | | | | | |
| Supplies/Ingredients | 299,061 | 249,030 | 244,386 | 262,441 | 176,254 | 155,387 | 257,068 | 464,600 | 753,900 | 245,006 | 226,129 | 189,853 |
| Packaging | 173,613 | 135,326 | 134,003 | 149,186 | 167,209 | 152,698 | 201,976 | 269,357 | 243,400 | 160,527 | 139,748 | 111,560 |
| Work in Process | 942,457 | 1,317,721 | 1,718,740 | 2,134,589 | 1,339,234 | 1,581,461 | 1,759,192 | 1,892,471 | 1,531,360 | 162,594 | 28,926 | 354,281 |
| Tank Inventory | 12,972,355 | 12,746,598 | 12,476,185 | 12,207,539 | 5,836,115 | 5,599,942 | 5,474,449 | 5,238,012 | 5,216,701 | 5,820,502 | 5,711,440 | 5,497,005 |
| Refrigerated Products | 853,409 | 673,378 | 449,178 | 370,200 | 299,455 | 233,671 | 183,436 | 130,797 | 551,178 | 614,267 | 476,910 | 331,236 |
| Fresh Pack | 3,929 | 1,359 | 8,787 | 9,363 | 28,750 | 1,242 | 803 | 734 | 708 | | | |
| Shelf Stable Products | 277,555 | 223,822 | 159,877 | 18,436 | 153,205 | 192,413 | 107,464 | 146,143 | 136,100 | 119,072 | 147,251 | 120,969 |
| Total Inventory | 15,521,779 | 15,347,234 | 15,191,156 | 15,151,754 | 8,000,222 | 7,916,814 | 7,984,387 | 8,142,115 | 8,433,347 | 7,121,968 | 6,730,404 | 6,604,904 |
| | | | | | | | | | | | | |
| Prepaids & Other Current Assets | 371,673 | 390,121 | 378,681 | 333,900 | 349,360 | 324,004 | 301,195 | 346,489 | 369,678 | 67,341 | 59,850 | 45,213 |
| Total Current Assets | 16,999,536 | 16,869,338 | 16,807,623 | 16,823,156 | 9,705,665 | 9,622,497 | 9,528,714 | 9,910,463 | 10,023,698 | 8,531,666 | 7,750,582 | 7,596,116 |
| | | | | | | | | | | | | |
| **PROPERTY AND EQUIPMENT** | | | | | | | | | | | | |
| Land & Buildings | 2,650,281 | 2,650,281 | 2,650,281 | 2,650,281 | 2,650,281 | 2,650,281 | 2,650,281 | 2,650,281 | 2,650,281 | 2,650,281 | 2,650,281 | 2,650,281 |
| Crop-Producing Plants | | | | | 1,920,000 | 1,920,000 | 1,920,000 | 1,920,000 | 1,920,000 | 1,920,000 | 1,920,000 | 1,920,000 |
| Equipment | 7,688,410 | 7,694,410 | 7,694,410 | 7,694,410 | 7,694,410 | 7,694,410 | 7,694,410 | 7,694,594 | 7,694,594 | 7,695,977 | 7,696,312 | 7,717,314 |
| Total Property and Equipment | 10,338,690 | 10,344,690 | 10,344,690 | 10,344,690 | 12,264,690 | 12,264,690 | 12,264,690 | 12,264,875 | 12,264,875 | 12,266,257 | 12,266,593 | 12,287,595 |
| Less: Accumulated Depreciation | (3,543,437) | (3,564,946) | (3,610,455) | (3,643,964) | (3,677,473) | (3,711,203) | (3,744,932) | (3,778,661) | (3,812,390) | (3,846,119) | (3,857,238) | (2,819,561) |
| Property and Equipment - Net | 6,795,253 | 6,779,744 | 6,734,235 | 6,700,726 | 8,587,217 | 8,553,488 | 8,519,759 | 8,486,214 | 8,452,485 | 8,420,138 | 8,409,355 | 9,468,034 |
| | (21,509) | (21,509) | (45,509) | (33,509) | (33,509) | (33,729) | (33,729) | (33,729) | (33,729) | (33,729) | (11,119) | |
| | | | | | | | | | | | | |
| **OTHER ASSETS** | | | | | | | | | | | | |
| Brine | | | | | | | | | | | | |
| Note Receivable PVF | | | | | 1,054,878 | 1,054,878 | 1,054,878 | 1,054,878 | 1,054,878 | 1,054,878 | 1,054,878 | 1,054,878 |
| Deferred Loan Charges | 306,942 | 306,942 | 306,942 | 306,942 | 306,942 | 306,942 | 306,942 | 306,942 | 306,942 | 306,942 | 306,942 | 306,942 |
| Less: Accumulated Amortization | (202,284) | (227,735) | (216,460) | (217,186) | (217,910) | (218,636) | (220,086) | (220,810) | (221,536) | (222,261) | (222,987) | (223,712) |
| Total Other Assets | 104,658 | 79,207 | 90,482 | 89,756 | 1,143,909 | 1,143,184 | 1,141,734 | 1,141,009 | 1,140,284 | 1,139,559 | 1,138,833 | 1,138,108 |
| | | | | | | | | | | | | |
| **TOTAL ASSETS** | 23,899,446 | 23,728,289 | 23,632,340 | 23,613,638 | 19,436,792 | 19,319,169 | 19,190,206 | 19,537,686 | 19,616,467 | 18,091,363 | 17,298,770 | 18,202,257 |

Disclaimer: Actuals are unaudited.

**Exhibit A**

# Pleasant Valley Farms (Consolidated)
## Balance Sheet
### 2012

| | Jan-12 | Feb-12 | Mar-12 | Apr-12 | May-12 | Jun-12 | Jul-12 | Aug-12 | Sep-12 | Oct-12 | Nov-12 | Dec-12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CURRENT LIABILITIES** | | | | | | | | | | | | |
| **Post Petition Balances** | | | | | | | | | | | | |
| Accounts Payable | - | - | - | - | - | - | - | 264,155 | 475,722 | 348,355 | 230,525 | 422,181 |
| Growers Payable | - | - | - | - | - | - | - | - | 184,947 | 211,515 | 320,778 | 299,389 |
| Bank Overdraft | - | - | - | - | - | - | - | 32,294 | 77,798 | | | |
| Accrued Wages and Taxes | - | - | - | - | - | - | - | 32,818 | 15,690 | 333,575 | 358,626 | 297,301 |
| Professional Fees | - | - | - | - | - | - | - | - | - | 445,605 | 609,153 | 519,681 |
| Marketing Accruals | - | - | - | - | - | - | - | - | - | 24,266 | 180,133 | 71,914 |
| Notes Payable (DIP Loan) | - | - | - | - | - | - | - | 249,997 | 254,340 | 550,000 | 577,478 | 597,167 |
| Other Current Liabilities | - | - | - | - | - | - | - | 16,309 | 93,289 | - | | |
| **Total Post Petition Balances** | - | - | - | - | - | - | - | 595,573 | 1,101,786 | 1,913,316 | 2,276,693 | 2,207,633 |
| | | | | | | | | | | | | |
| **Pre Petition** | | | | | | | | | | | | |
| Accounts Payable | 4,144,694 | 4,128,052 | 4,089,424 | 3,938,103 | 3,722,934 | 3,785,890 | 3,792,579 | 3,989,082 | 3,995,021 | 3,574,247 | 3,581,155 | 3,605,002 |
| Bank Overdraft | 80,773 | 83,746 | 75,487 | 74,877 | 192,461 | 21,550 | 143,845 | 34,824 | - | - | - | - |
| Credit Cards Payable | 91,842 | 93,872 | 95,165 | 91,380 | 90,984 | 110,157 | 105,034 | 106,229 | 106,229 | 42,382 | 42,382 | 42,382 |
| Grower Payables | 2,834,009 | 2,830,063 | 2,828,063 | 2,911,946 | 2,915,207 | 2,918,973 | 2,791,463 | 2,792,045 | 2,790,547 | 2,793,020 | 2,793,020 | 2,793,000 |
| Wages & Payroll Taxes Payable | 1,174,133 | 1,133,586 | 1,157,271 | 1,189,037 | 1,277,964 | 1,297,989 | 1,263,054 | 1,246,941 | 1,250,422 | 1,401,299 | 1,401,299 | 1,424,553 |
| Notes Payable to Individuals | 1,983,122 | 2,644,160 | 2,530,741 | 2,529,943 | 2,539,683 | 2,554,282 | 2,679,223 | 2,679,259 | 2,679,256 | 255,965 | 255,965 | 7,533 |
| Interest Payable | 235,036 | 292,638 | 293,911 | 308,221 | 319,721 | 333,221 | 353,921 | 359,582 | 359,582 | 423,490 | 423,490 | 56,986 |
| Other Current Liabilities | 297,828 | 270,378 | 266,614 | 239,937 | 218,969 | 187,834 | 181,051 | 204,727 | 174,314 | - | - | - |
| Loans from Shareholders | - | | | | | | | | | | | |
| **Total Pre Petition Balances** | 10,841,436 | 11,476,494 | 11,336,676 | 11,281,443 | 11,277,923 | 11,209,896 | 11,310,171 | 11,412,689 | 11,355,371 | 8,490,403 | 8,497,311 | 7,929,476 |
| | | | | | | | | | | | | |
| **Intercompany Payables** | | | | | | | | | | | | |
| Intercompany Payable-SH | 1,439,765 | - | - | - | - | - | - | - | - | - | - | - |
| Intercompany Payable-MVP | 363,901 | - | - | - | - | - | - | - | - | - | - | - |
| Current Portion of Capital Leases | 35,141 | 35,141 | 35,141 | 35,141 | 35,141 | 33,174 | 30,962 | 28,698 | 26,416 | 24,115 | 21,795 | 19,456 |
| Current Portion of Long Term Debt | 1,037,070 | 1,037,070 | 1,037,070 | 1,037,070 | 1,037,070 | 1,037,071 | 1,037,071 | 1,037,071 | 1,037,071 | 1,037,071 | 1,037,071 | 1,037,071 |
| **Total Pre Petition Balances** | 2,875,876 | 1,072,211 | 1,072,211 | 1,072,211 | 1,072,211 | 1,070,244 | 1,068,032 | 1,065,769 | 1,063,487 | 1,061,186 | 1,058,866 | 1,056,527 |
| | | | | | | | | | | | | |
| **Total Current Liabilities** | 13,717,313 | 12,548,705 | 12,408,887 | 12,353,654 | 12,350,134 | 12,280,140 | 12,378,203 | 13,074,031 | 13,520,644 | 11,464,905 | 11,832,869 | 11,193,635 |
| | | | | | | | | | | | | |
| **LONG TERM LIABILITIES** | | | | | | | | | | | | |
| Notes Payable -Secured | 6,925,690 | 7,991,138 | 7,986,477 | 7,960,671 | 7,945,307 | 7,934,231 | 7,921,453 | 7,872,393 | 7,839,722 | 8,391,713 | 8,611,487 | 8,336,123 |
| Notes Payable - Unsecured | - | - | - | - | - | - | - | - | - | 2,892,479 | 2,892,479 | 3,707,535 |
| Convertible Debt | 707,773 | 707,773 | 707,773 | 707,773 | 707,773 | 707,773 | 707,773 | 707,773 | 707,773 | 707,773 | 707,773 | 707,773 |
| Stockholder Loans Payable | 298,328 | 298,304 | 298,280 | 298,256 | 298,232 | 298,153 | 293,972 | 279,926 | 279,926 | 350,208 | 350,208 | 492,172 |
| Capital Lease Obligations | 44,125 | 41,971 | 39,799 | 37,608 | 35,400 | 33,174 | 30,962 | 28,698 | 26,416 | 24,115 | 21,795 | 34,456 |
| Less Current Portion | (1,072,211) | (1,072,211) | (1,072,211) | (1,072,211) | (1,072,211) | (1,070,244) | (1,068,032) | (1,065,769) | (1,063,487) | (1,061,186) | (1,058,866) | (1,055,527) |
| Long Term Liabilities Net of Current Portion | 6,903,705 | 7,366,975 | 7,360,118 | 7,932,098 | 7,914,502 | 7,903,086 | 7,886,127 | 7,823,022 | 7,790,351 | 11,305,102 | 11,524,876 | 12,221,531 |
| | | | | | | | | | | | | |
| **TOTAL LIABILITIES** | 20,621,018 | 20,515,680 | 20,369,006 | 20,285,752 | 20,264,635 | 20,183,226 | 20,264,330 | 20,897,053 | 21,310,995 | 22,770,007 | 23,357,745 | 23,415,166 |
| | | | | | | | | | | | | |
| **STOCKHOLDERS/MEMBERS EQUITY** | | | | | | | | | | | | |
| Common Stock | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Paid in Capital | 1,093,049 | 1,093,049 | 1,093,049 | 1,093,049 | 1,093,049 | 1,093,049 | 1,093,049 | 1,093,049 | 1,093,049 | 1,093,049 | 1,093,048 | 1,093,049 |
| Distributions | (103,782) | (104,782) | (105,432) | (140,407) | (143,103) | (146,503) | (161,303) | (163,422) | (163,422) | (163,422) | (163,422) | (163,422) |
| Beginning Ret Earnings | 2,303,293 | 2,194,266 | 2,193,616 | 2,193,615 | 2,307,820 | 2,307,812 | 2,280,038 | 2,279,640 | 2,093,330 | 2,279,639 | 2,318,459 | 2,318,459 |
| Current Year Earnings | (14,631) | 29,576 | 81,601 | 181,129 | (4,086,109) | (4,118,915) | (4,286,409) | (4,569,133) | (4,717,984) | (7,888,409) | (9,307,562) | (8,461,495) |
| **Total Equity** | 3,278,429 | 3,212,609 | 3,263,334 | 3,327,886 | (827,843) | (864,057) | (1,074,124) | (1,359,366) | (1,694,528) | (4,678,644) | (6,058,976) | (5,212,909) |
| | | | | | | | | | | | | |
| **TOTAL LIABILITIES AND EQUITY** | 23,899,446 | 23,728,289 | 23,632,340 | 23,613,638 | 19,436,792 | 19,319,169 | 19,190,206 | 19,537,686 | 19,616,467 | 18,091,363 | 17,298,769 | 18,202,257 |

Disclaimer: Actuals are unaudited.

**Exhibit A**

Cascade Ag Services, Inc.
dba Pleasant Valley Farms
Balance Sheet
2013

| | January 2013 | February 2013 | March 2013 |
|---|---|---|---|
| **CURRENT ASSETS** | | | |
| Cash on Hand and In Banks | 55,902 | 149,658 | 118,604 |
| Accounts Receivable | 1,072,718 | 1,146,110 | 1,477,122 |
| Inventory | | | |
| Supplies/Ingredients | 201,300 | 183,637 | 134,724 |
| Packaging | 117,214 | 105,024 | 116,805 |
| Work In Process | 294,733 | 360,555 | 439,994 |
| Tank Inventory | 5,358,919 | 5,211,335 | 5,061,869 |
| Refrigerated Products | 234,911 | 238,106 | 84,251 |
| Fresh Pack | - | - | - |
| Shelf Stable Products | 154,410 | 153,763 | 212,206 |
| **Total Inventory** | 6,361,488 | 6,252,420 | 6,049,849 |
| Prepaids & Other Current Assets | 36,660 | 37,752 | 68,437 |
| **Total Current Assets** | 7,526,767 | 7,585,940 | 7,714,012 |
| | | | |
| **PROPERTY AND EQUIPMENT** | | | |
| Land & Buildings | 2,650,281 | 2,650,281 | 2,650,281 |
| Crop-Producing Plants | 1,920,000 | 1,920,000 | 1,920,000 |
| Equipment | 7,717,314 | 7,717,314 | 7,718,209 |
| **Total Property and Equipment** | 12,287,594 | 12,287,595 | 12,288,490 |
| Less: Accumulated Depreciation | (2,858,924) | (2,898,987) | (2,939,050) |
| **Property and Equipment - Net** | 9,428,671 | 9,388,608 | 9,349,440 |
| | | | |
| **OTHER ASSETS** | | | |
| Brine | 1,054,878 | 1,054,878 | 1,054,878 |
| Note Receivable PVF | - | - | - |
| Deferred Loan Charges | 306,942 | 306,942 | 306,942 |
| Less: Accumulated Amortization | (224,437) | (225,162) | (225,887) |
| **Total Other Assets** | 1,137,383 | 1,136,658 | 1,135,933 |
| | | | |
| **TOTAL ASSETS** | 18,092,820 | 18,111,206 | 18,199,386 |

**Exhibit A**

Cascade Ag Services, Inc.
dba Pleasant Valley Farms
Balance Sheet
2013

| | January 2013 | February 2013 | March 2013 |
|---|---|---|---|
| **CURRENT LIABILITIES** | | | |
| **POST-PETITION LIABILITIES** | | | |
| Accounts Payable | 221,923 | 311,530 | 317,190 |
| Growers Payable | 263,120 | 219,680 | 177,491 |
| Bank Overdraft | - | | |
| Accrued Wages and Taxes | 225,787 | 266,437 | 290,387 |
| Professional Fees | 749,719 | 781,483 | 800,531 |
| Marketing Accruals | 162,589 | 198,008 | 241,035 |
| Notes Payable (DIP Loan) | 728,294 | 595,430 | 598,711 |
| Other Current Liabilities | - | 26,075 | 9,640 |
| **Total Postpetition Liabilities** | **2,351,431** | **2,398,643** | **2,434,985** |
| | | | |
| **PRE-PETITION LIABILITIES** | | | |
| Accounts Payable | 3,414,177 | 3,403,963 | 3,406,062 |
| Bank Overdraft | - | | |
| Credit Cards Payable | 42,382 | 42,382 | 42,382 |
| Growers Payable | 2,793,020 | 2,793,020 | 2,793,020 |
| Accrued Wages and Taxes | 1,423,456 | 1,423,456 | 1,423,456 |
| Notes Payable to Individuals | - | - | - |
| Interest Payable | - | - | - |
| Other Current Liabilities | - | - | - |
| Current Portion of Capital Leases | 17,097 | 14,719 | 12,511 |
| Current Portion of Long Term Debt | 1,037,071 | - | - |
| **Total Pre Petition Balances** | **8,727,202** | **7,677,538** | **7,677,431** |
| | | | |
| **Total Current Liabilities** | **11,078,633** | **10,076,180** | **10,112,415** |
| | | | |
| **LONG TERM LIABILITIES** | | | |
| Notes Payable -Secured | 8,439,903 | 8,497,654 | 8,496,654 |
| Notes Payable - Unsecured | 3,809,417 | 3,809,417 | 3,809,417 |
| Convertible Debt | 707,773 | 707,773 | 707,773 |
| Stockholder Loans Payable | 492,172 | 492,172 | 492,172 |
| Capital Lease Obligations | 12,000 | 9,000 | 6,000 |
| Less: Current Portion | (1,037,071) | - | - |
| **Total Long Term Liabilities** | **12,424,193** | **13,516,016** | **13,512,016** |
| **TOTAL LIABILITIES** | **23,502,826** | **23,592,196** | **23,624,430** |
| | | | |
| **STOCKHOLDERS/MEMBERS EQUITY** | | | |
| Common Stock | 500 | 500 | 500 |
| Paid in Capital | 1,093,049 | 1,093,049 | 1,093,049 |
| Distributions | (163,422) | (163,422) | (163,422) |
| Beginning Ret Earnings | (6,143,037) | (6,143,037) | (6,143,037) |
| Current Year Earnings | (197,096) | (268,081) | (212,134) |
| **Total Stockholders/Member Equity** | **(5,410,006)** | **(5,480,990)** | **(5,425,045)** |
| | | | |
| **TOTAL LIABILITIES & EQUITY** | **18,092,820** | **18,111,206** | **18,199,385** |

Note: As part of an ongoing effort to more accurately reflect Company financials, the Company has
reformatted numerous line items presented and reclassed balances when appropriate to better
mirror the Company's business and the bankruptcy case.  As part of this effort, October liabilities
have been restated since originally presented to reflect proper classification of Pre- and Post-

**Exhibit A**

**Pleasant Valley Farms (Consolidated)**
**Income Statement**
**2012**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Pre Aug | Post Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REVENUES | 1,203,564 | 943,967 | 1,203,480 | 1,347,723 | 1,366,263 | 1,324,492 | 1,314,227 | 531,958 | 792,942 | 1,936,205 | 401,568 | 1,150,295 | 953,978 |
| LOWER OF COST OR MARKET ADJUSTMENT | - | - | - | - | 4,350,200 | - | - | - | - | - | (4,350,200) | - | - |
| COST OF GOODS SOLD | 704,463 | 387,609 | 628,210 | 704,691 | 750,506 | 759,299 | 778,113 | 341,125 | 408,076 | 1,047,992 | 1,770,696 | 908,065 | 191,791 |
| **GROSS PROFIT** | 499,101 | 556,357 | 575,270 | 643,033 | (3,734,444) | 565,194 | 536,114 | 190,834 | 384,866 | 888,213 | 2,981,073 | 242,230 | 762,187 |
| *% Revenues* | *41%* | *59%* | *48%* | *48%* | *(273%)* | *43%* | *41%* | *36%* | *49%* | *46%* | *742%* | *21%* | *80%* |
| OPERATING GENERAL, & ADMINISTRATIVE EXPENSES | | | | | | | | | | | | | |
| Sales & Marketing | 245,364 | 237,164 | 311,670 | 325,465 | 298,257 | 314,455 | 305,584 | (2,226,995) | 189,036 | 2,885,093 | 150,715 | 524,249 | 308,835 |
| Warehousing & Shipping | 41,811 | 41,037 | 26,857 | 50,791 | 39,529 | 45,200 | 69,427 | 2,010,399 | 51,280 | (1,849,612) | (360,289) | 15,971 | 20,587 |
| Administrative Wages | 42,907 | 26,519 | 35,147 | 41,356 | 58,927 | 42,965 | 40,110 | 86,410 | 27,805 | 28,682 | 121,522 | 76,830 | 71,481 |
| Insurance | 8,164 | 7,021 | 7,021 | 7,467 | 11,454 | 7,560 | 7,560 | 285,534 | 174 | (269,773) | 13,622 | 22,579 | 12,971 |
| Professional Services | 53,360 | 92,618 | 21,005 | 10,210 | 30,603 | 82,598 | 171,052 | (533,732) | 136,265 | 927,671 | (953,042) | 28,400 | - |
| Taxes | (3,818) | - | 1,565 | 2,839 | 2,492 | 2,824 | 2,047 | 715,607 | 1,050 | (710,409) | 762 | 1,282 | 1,476 |
| Office Rent | 5,595 | 3,280 | 3,927 | 3,032 | 1,780 | 4,950 | 6,181 | (19,143) | 1,736 | 32,311 | 2,376 | 3,850 | 8,146 |
| Office Expense | 4,356 | 3,150 | 3,087 | 4,894 | 7,579 | 2,902 | 8,092 | 868 | 1,621 | 6,032 | 2,987 | 3,217 | 10,669 |
| Utilities & Telephone | 1,358 | 440 | 322 | 858 | 526 | 671 | 374 | 33,259 | 136 | (32,388) | 1,117 | 1,267 | (7,939) |
| Licenses & Permits | 209 | 3,202 | 1,348 | 1,132 | 1,760 | 1,142 | 2,524 | (7,578) | 1,131 | 15,132 | (860) | 917 | 770 |
| Other Expenses | 570 | 193 | 2,458 | 11,795 | 430 | 96 | 2,429 | (3,394) | - | 5,260 | (10,436) | (14,421) | 4,008 |
| Depreciation & Amortization | 1,728 | 1,671 | 945 | 945 | 945 | 1,166 | 1,891 | 7,909 | 769 | (5,578) | 397 | (156) | (1,697) |
| Total Operating, General & Admin Expenses | 401,604 | 416,294 | 415,353 | 460,786 | 454,282 | 506,530 | 617,270 | 349,145 | 410,962 | 1,032,423 | (1,031,129) | 664,025 | 429,307 |
| **INCOME FROM OPERATIONS** | 97,497 | 140,064 | 159,916 | 182,247 | (4,188,726) | 58,664 | (81,156) | (158,311) | (26,096) | (144,210) | 4,012,202 | (421,795) | 332,880 |
| OTHER INCOME (EXPENSE): | | | | | | | | | | | | | |
| Miscellaneous Income | - | (17,718) | (312) | - | (93) | - | (478) | 19,027 | (425) | (1,460) | 1,467 | - | - |
| Inventory Valuation Adjustment | - | - | - | - | - | - | - | (18,688) | - | 18,688 | (4,350,200) | 0 | (912,315) |
| Reorganization Expenses | - | - | - | - | - | - | - | - | - | - | (2,151,267) | (796,156) | 921,489 |
| Interest Expense | (112,128) | (78,138) | (107,579) | (82,719) | (78,420) | (91,470) | (85,859) | 674,941 | (38,628) | (821,562) | (173,235) | (1,936) | (139,496) |
| Total Other Income (Expense) | (112,128) | (95,856) | (107,892) | (82,719) | (78,513) | (91,470) | (86,337) | 675,280 | (39,052) | (804,335) | (6,673,235) | (798,092) | (130,322) |
| **NET INCOME** | (14,631) | 44,208 | 52,025 | 99,528 | (4,267,238) | (32,806) | (167,493) | 516,968 | (65,148) | (948,544) | (2,661,033) | (1,219,888) | 202,558 |

Disclaimer: Actuals are unaudited.

**Exhibit A**

**Cascade Ag Services, Inc.**
**dba Pleasant Valley Farms**
**Income Statement**
**2013**

| | January 2013 | February 2013 | March 2013 |
|---|---|---|---|
| REVENUES | $ 1,138,596 | $ 1,136,639 | $ 1,298,646 |
| LOWER OF COST OR MARKET ADJUSTMENT | | | |
| COST OF GOODS SOLD | 771,213 | 760,640 | 800,559 |
| **GROSS PROFIT** | $ 367,383 | $ 375,999 | $ 498,087 |
| OPERATING GENERAL, & ADMINISTRATIVE EXPENSES | | | |
| Sales & Marketing | $ 194,422 | $ 271,259 | $ 206,077 |
| Warehousing & Shipping | 28,855 | 28,224 | 24,598 |
| Administrative Wages | 64,177 | 74,466 | 69,615 |
| Insurance | 13,975 | 16,055 | 16,066 |
| Professional Services | (385) | 5,020 | 5,962 |
| Taxes | 838 | 620 | 700 |
| Office Rent | 2,145 | 3,891 | 3,890 |
| Office Expense | 3,744 | 11,140 | 8,603 |
| Utilities & Telephone | 13,907 | 17,650 | 17,167 |
| Licenses & Permits | 3,608 | 575 | 480 |
| Other Expenses | 345 | 467 | 789 |
| Depreciation & Amortization (1) | 20,504 | 40,063 | 39,763 |
| **Total Operating, General & Admin Expenses** | 344,131 | 469,430 | 393,718 |
| **INCOME FROM OPERATIONS** | $ 23,252 | $ (93,431) | $ 104,369 |
| OTHER INCOME (EXPENSE): | | | |
| Miscellaneous Expense | | $ - | |
| Inventory Valuation Adjustment | | $ - | |
| Re-organization Expenses (2) | $ (151,798) | 28,331 | $ (42,500) |
| Interest Expense & Bank Fees (3) | (68,550) | (5,885) | (5,921) |
| **Total Other Income (Expense)** | $ (220,348) | $ 22,446 | $ (48,421) |
| **NET INCOME** | $ (197,096) | $ (70,985) | $ 55,948 |

(1) Depreciation Amounts previously reported within Cost of Goods Sold are now reported as separate and discreet

(2) Reorganization Expenses consist of professional fees, non-recurring inventory adjustments, and expenses incurred in reporting period.

(3) Interest Expense: Secured creditor claims for interest and legal fees of $531,235 are not incorporated within the num

**Exhibit A**

Pleasant Valley Farms (Consolidated)
Cash Flow Statement

|  | FYE 2012 | Mar-13 |
|---|---|---|
| **Cash Flows from Operations:** | | |
| Net Income | (8,461,495) | (344,811) |
| | | - |
| **Adjustments to Net Income:** | | - |
| Depreciation and Amortization | (668,939) | 162,476 |
| Total Adjustments to Net Income | (668,939) | 162,476 |
| | | |
| **Changes in Operating Assets and Liabilities:** | | |
| Accounts Receivable | 264,371 | (314,491) |
| Inventory | 8,967,224 | 722,612 |
| Other Current Assets | 60,845 | (172,140) |
| Other Assets | (1,054,878) | (0) |
| Accounts Payable | 107,443 | (153,917) |
| Grower Payables | 252,398 | (206,480) |
| Accrued Payroll and Taxes Payable | 505,372 | (54,776) |
| Professional Fees | | 223,434 |
| Marketing Accruals | | 78,400 |
| Notes Payable (DIP Loan) | | (16,446) |
| Other Current Liabilities | 170,628 | 26,200 |
| Total changes in operating assets and liabilities | 9,273,403 | 132,396 |
| | | |
| Net cash provided (used) by operations | 142,969 | (49,939) |
| | | |
| **Cash flows from investing activities:** | | |
| Purchases of property and equipment | (1,948,904) | (2,635) |
| | | |
| Total cash flows from investing activities | (1,948,904) | (2,635) |
| | | |
| **Cash flows from financing activities:** | | |
| Net change in long-term debt | 2,199,105 | 262,414 |
| Pre-Petition Liabilities | | (215,940) |
| Repayment of capital lease obligations | (13,604) | (21,554) |
| Stockholder Loans Payable | 193,844 | 0 |
| Loan Fees | 1,508 | - |
| Accrued Interest | (396,200) | (56,986) |
| Equity Changes (Non-Income) | (59,640) | 0 |
| | | |
| Total cash flows from financing activities | 1,925,013 | (32,066) |
| | | |
| Net increase (decrease) in cash and equivalents | 119,077 | (84,640) |
| | | |
| Cash and equivalents, beginning | 5,787 | 124,864 |
| Net increase (decrease) in cash and equivalents | 119,077 | (84,640) |
| | | |
| Cash and equivalents, ending | 124,864 | 40,224 |

**Exhibit A**

## List of Attached Exhibits

Exhibit A – Bidding Procedures Order

Exhibit B – Proposed form of Sale Order

Exhibit C – Form of FIRPTA Certificate

{02354287.DOCX;1 }
Asset Purchase Agreement
WEST\239378386.6
#903797 v1 / 45616-001

**Exhibit A**

Case 12-18366-KAO    Doc 554    Filed 08/02/13    Ent. 08/02/13 17:14:26    Pg. 56 of 97

Exhibit A
Bidding Procedures Order

{02354287.DOCX;1 }
Asset Purchase Agreement
WEST:239378386.6
#903797 v1 / 45616-001

Exhibit A

Case 12-18366-KAO    Doc 554    Filed 08/02/13    Ent. 08/02/13 17:14:26    Pg. 57 of 97

Entered on Docket June 28, 2013

**Below is the Order of the Court.**



Karen A. Overstreet
U.S. Bankruptcy Judge
**(Dated as of Entered on Docket date above)**

1
2
3
4
5
6
7
8

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9
10
11

12  In re:                                          IN CHAPTER 11 PROCEEDING

13  CASCADE AG SERVICES, INC.,                       NO. 12-18366-KAO

14                Debtor.                            [REVISED] [PROPOSED] ORDER
                                                     APPROVING SALE PROCEDURES

15

16      Upon the motion, dated June 28, 2013 (the "**Motion**"),[1] of Cascade Ag Services, Inc., the

17  debtor and debtor in possession in the above-captioned chapter 11 case (the "**Debtor**"), seeking

18  entry of an order (this "**Sale Procedures Order**") pursuant to sections 105, 363 and 365 of

19  title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002 and 9014 of the

20  Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), approving procedures for the

21  Sale of the Debtor's assets and the form and manner of notice; and the Court having reviewed

22  the Motion and heard the statements in support of the relief requested therein at a hearing before

23  the Court (the "**Hearing**") on June 28, 2013, if any; and having determined that the legal and

24  factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted

25

26  _____
[1] All capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the Motion.

[REVISED] [PROPOSED] ORDER APPROVING
SALE PROCEDURES - 1

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

**Exhibit A**

1  herein; and upon all of the proceedings had before the Court; and after due deliberation and

2  sufficient cause appearing therefore,

3      THE COURT HEREBY FINDS THAT:

4      A.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and

5  1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this

6  District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7      B.    Notice of the Motion and proposed entry of this Sale Procedures Order was

8  proper and sufficient for all purposes under the Bankruptcy Code, including, without limitation,

9  section 102(1) of the Bankruptcy Code, and no further notice of, or hearing on, the Motion with

10  respect to this Sale Procedures Order is necessary or required.

11      C.    The Debtor has articulated good and sufficient reasons for this Court to approve

12  the sale procedures set forth in the Motion.

13      D.    The Debtor has articulated good and sufficient reasons for a Break-Up Fee to be

14  paid to the Stalking Horse subject to the modifications set forth in this Order and with the

15  modifications to the Break-Up Fee herein, the Break-Up Fee is reasonable and appropriate given,

16  among other things, the size and nature of the transaction and the efforts that have been

17  expended and will continue to be expended by the Stalking Horse in connection with the Sale.

18      E.    The entry of this Sale Procedures Order is in the best interests of the Debtor, the

19  estate, its creditors, and other parties with an interest in this bankruptcy case.

20  IT IS HEREBY ORDERED THAT:

21      1.    The Motion is granted to the extent provided herein.

22      2.    All objections, if any, to the Debtor's request for entry of this Sale Procedures

23  Order that have not been withdrawn, waived, or settled as announced to the Court at, or prior to,

24  the Hearing or by stipulation are hereby overruled.

25      3.    The sale procedures (the "**Sale Procedures**") substantially in the form attached

26  hereto as **Exhibit A**, are hereby approved as amended herein.  The failure to specifically include

[REVISED] [PROPOSED] ORDER APPROVING
SALE PROCEDURES - 2

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office  206  587  0700  fax: 206  587  2308

Exhibit A

1    or reference any particular provision, section or article of the Sale Procedures in this Sale

2    Procedures Order shall not diminish or impair the effectiveness of such provision, it being the

3    Court's intent that the Sale Procedures be authorized and approved in their entirety unless

4    otherwise modified by this Order.

5         4.      Service of the Motion as set forth in the Proof of Service filed by the Debtor

6    constitutes good and sufficient notice of the Sale and the Sale Procedures.

7         5.      The Stalking Horse shall be deemed a Final Bidder, and the APA shall be deemed

8    a Qualified Bid, upon entry of this Order.

9         6.      The Stalking Horse shall, no later than **5:00 p.m. on Friday, July 26, 2013**,

10    inform the Debtor, and file with the Court, its best estimate of the amount of the Break-Up Fee

11    (as defined in paragraph 17 below) based upon the actual third-party, out-of-pocket expenses the

12    Stalking Horse has incurred through July 26, 2013, which amount shall be announced at the

13    Auction, if the Auction occurs.

14         7.      One PacificCoast Bank, Washington Federal and Columbia State Bank

15    (collectively the "Senior Secured Creditors"), Skagit Farmers and RSF Mezzanine Fund shall be

16    deemed Qualified Bidders and excused from satisfying the Qualified Bid requirements set forth

17    in Exhibit A hereto.

18         8.      In the event that the Debtor's counsel does not receive any other Qualified Bids

19    greater than the amount of the Stalking Horse bid by the Bid Deadline, the Sales Agent will not

20    hold the Auction, and shall report the same to the Court. In the event that the Debtor's counsel

21    receives only one additional Qualified Bid in addition to the Stalking Horse bid by the Bid

22    Deadline, the Sales Agent may, in its sole discretion, cancel the Auction and either: (a) designate

23    the Stalking Horse bid as the Winning Bid; (b) designate the additional Qualified Bid as the

24    Winning Bid; or (c) decline to designate the Stalking Horse bid or the additional Qualified Bid as

25    the Winning Bid, and report the same to the Court. In the event no Winning Bid is approved by

26    the Sales Agent, the Sales Agent, on behalf of the Debtor, shall, as set forth below in Section 13,

[REVISED] [PROPOSED] ORDER APPROVING
SALE PROCEDURES - 3

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 **Exhibit A**

file, by the date that the Auction Report (as defined below) would otherwise be due, a request for approval of alternative disposition procedures.

9. The Debtor shall, no later than **5:00 p.m. July 19, 2013**, circulate to the Senior Secured Creditors and the Official Unsecured Creditors' Committee, a copy of each Qualified Bid actually received by the Debtor by the Bid Deadline as defined in Exhibit A.

10. The Debtor shall, no later than **July 22, 2013** file a motion to approve the sale of the Debtor's assets (the "**Sale Motion**") seeking entry by the Court of an order that, among other things, authorizes and approves the sale of the Debtor's assets (a) to the Stalking Horse, in the event no other Qualified Bid is received that is designated by the Sales Agent as the Winning Bid or (b) to the Winning Bid, if a Qualified Bid is received and accepted by the Sales Agent as the Winning Bid. If the Sales Agent elects to conduct an Auction, the deadline set by this paragraph is moot.

11. To the extent the Sales Agent receives one or more Qualified Bids which contain a credit bid component and there is any dispute, including a dispute over how such credit bid shall be given value in the Auction and treated vis-à-vis any other Qualified Bidder at the Auction or whether such creditor may participate as a Final Bidder, the Court shall hold a hearing on **July 25, 2013 at 9:30 a.m.** to adjudicate such credit bid disputes. Any Qualified Bidder intending to object must file a written objection with the Court on or before **July 23, 2013**.

12. The Auction, if one is required, shall be conducted at the offices of Cairncross & Hempelmann, P.S., 524 2nd Ave, Suite 500 Seattle, WA 98104, or such other location as may be agreed upon by the Sales Agent and the Final Bidders in order to accommodate the number of participants, commencing on **July 30, 2013 at 9:00 a.m. (Pacific Daylight Time)**.

13. In the event an Auction is conducted, the Sales Agent, on behalf of the Debtor, shall, by **August 2, 2013**, file a report (the "**Auction Report**") that identifies, among other things: (a) the identity of the Winning Bidder; (b) the identity of the Alternative Bidder; (c) an executed purchase and sale agreement; and (d) any additional executory contracts or leases to be

[REVISED] [PROPOSED] ORDER APPROVING
SALE PROCEDURES - 4

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

**Exhibit A**

assumed and assigned to the Winning Bidder in connection with the Sale. The Debtor shall file contemporaneous with the filing of the Auction Report, the Sales Motion for authorization and approval of the sale of the Debtor's Assets to the Winning Bidder. The Debtor shall annex to the Sales Motion, as an exhibit, a proposed order approving the Sale on the terms set forth in the Winning Bid, and shall serve the Sales Motion and the Auction Report on all parties in interest in this case.

14.　A hearing seeking Court approval of the Sale on the terms set forth in the Winning Bid (the "**Sale Hearing**") shall be held **during the week of August 12, 2013** at a date and time certain to be determined. .

15.　Objections to the Sale shall be filed and served by **August 6, 2013**, and the Debtor's reply shall be due no later than **August 8, 2013**.

16.　The Break-Up Fee, as defined in the Section 10.5 of the APA is denied and hereby deleted from the terms of the APA.

17.　A new Break-Up Fee ("Approved Break-Up Fee") is approved as follows:

> **Approved Break-Up Fee.** If the termination of the APA is by the Debtor pursuant to Section 10.1(e) of the APA due to this Court approving a sale of all or part of the Acquired Assets by sale to a Bidder(s) other than the Stalking Horse Bidder, the Debtor shall pay the Stalking Horse Bidder in cash, at the Closing of such transaction(s) and prior to disbursement of Debtor's funds to any third party including the secured creditors, the Stalking Horse Bidder's reasonable and actual expenses, as determined by this Court, incurred solely in connection with this transaction up to $100,000.00 ("Break-Up Fee"), which shall constitute an administrative expense of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 503(b).

18.　If the Approved Break-Up Fee is triggered, the Debtor shall pay the Approved Break-Up Fee to the Stalking Horse pursuant to the terms and conditions set forth in section 13, subject to documentation. If a party in interest objects to the amount of the Approved Break-Up

[REVISED] [PROPOSED] ORDER APPROVING
SALE PROCEDURES - 5

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

{02304269.DOCX;1}

Exhibit A

Fee, it shall not be paid until after notice and a hearing before the Court, which hearing may address, among other things, the reasonableness of the actual out-of-pocket third-party expenses incurred in connection with the Sale. The Approved Break-Up Fee shall be paid at the closing of any Alternative Transaction (as that term is defined in the APA) and shall be paid concurrently or ahead of any other distributions or payments by the Debtor contemplated in connection with such Alternative Transaction by the successful bidder. The Debtor's obligation to pay the Approved Break-Up Fee shall constitute superpriority administrative expense obligations of the Debtor under Sections 503(b) and 507(b) of the Bankruptcy Code.

19. If, at any time between the entry of an order approving the Sale Procedures Motion and the time that the Sales Agent designates a Winning Bidder, the Stalking Horse terminates the APA, unless pursuant to APA Sections10.1(a)-(c), the Stalking Horse's Bid Deposit shall be fully forfeited to the Debtor.

20. This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Sale Procedures Order.

///End of Order///

Presented by:

**CAIRNCROSS & HEMPELMANN, P.S.**


*/s/ John R. Rizzardi*
John R. Rizzardi, WSBA No. 9388
Jessica C. Tsao, WSBA No. 44382
Attorneys for Debtor

[REVISED] [PROPOSED] ORDER APPROVING
SALE PROCEDURES - 6

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

Agreed as to form; notice of presentation waived

**FOSTER PEPPER PLLC**

_/s/ Deborah A. Crabbe_
Deborah A. Crabbe, WSBA No. 22263
Attorneys for Columbia State Bank

**BALL JANIK LLP**

_/s/ David W. Criswel_
David W. Criswell, WSBA No. 33410
Attorneys for One Pacific Coast Bank FSB

**LANE POWELL PC**

_/s/ Charles R. Ekberg_
Charles R. Ekberg, WSBA No. 342
Attorneys for Washington Federal Bank

[REVISED] [PROPOSED] ORDER APPROVING
SALE PROCEDURES - 7

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office  206  587  0700  fax:  206 **Exhibit A**

**EXHIBIT A TO SALE PROCEDURES ORDER**

**Sale Procedures**

On [•], the United States Bankruptcy Court for the Western District of Washington (the "**Court**" or the "**Bankruptcy Court**") entered the *Order Approving Sale Procedures* [Docket No. •] (the "**Sale Procedures Order**"), by which the Bankruptcy Court approved the procedures outlined below (the "**Sale Procedures**"). The Court has previously appointed Red to Black Advisors, LLC as the sales agent (the "**Sales Agent**") to oversee the sale.

The sale of the Debtor's assets (the "**Sale**") will take place by auction and is subject to competitive bidding as set forth herein and approval of a sale to the highest or otherwise best qualified bid by the Bankruptcy Court at a hearing (the "**Sale Hearing**") pursuant to sections 105, 363 and 365 of title 11 of the United State Code (the "**Bankruptcy Code**").

**1.**     <u>**Participation Requirements**</u>

Only those persons or entities who are determined in the Sales Agent's sole judgment to be capable of consummating the Sale and who, no later than **July 3, 2013**: (a) enter into a confidentiality agreement with the Debtor,[2] and (b) deliver to the Sales Agent any documentation reasonably requested by the Sales Agent to demonstrate the ability to fund a successful bid shall be entitled to participate in the auction of the Debtor's assets (each such person or entity a "**Qualified Bidder**"). No person or entity shall be a Qualified Bidder until the Sales Agent has confirmed in writing that such person or entity is a Qualified Bidder.

**2.**     <u>**Stalking Horse**</u>

Triak Holdings, LLC (the "**Stalking Horse**") has been designated by the Debtor to be the "stalking horse" bidder for the Sale. The Stalking Horse shall be deemed a Final Bidder (as defined below), and the asset purchase agreement dated June 21, 2013, between the Stalking Horse and the Debtor shall be deemed a Qualified Bid (as defined below).

**3.**     <u>***Due Diligence***</u>

Only Qualified Bidders may conduct due diligence, and all due diligence must be completed by **5:00 p.m. (Pacific Daylight Time) on July 12, 2013**. At the Sales Agent's discretion, due diligence access may include management presentations, access to physical and online data rooms, on-site inspections, and such other matters that a Qualified Bidder may reasonably request and as to which Sales Agent, in its reasonable exercise of discretion, may agree.

The Sales Agent will coordinate all responses to requests for additional information and due diligence access, and may, in its sole discretion, coordinate due diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials. Neither the Debtor, the Sales Agent, nor any of their affiliates or representatives is obligated to furnish any information relating to any portion of the Debtor's assets to any person other than a Qualified Bidder.

---

[2] The Sales Agent may, in its sole discretion, require persons or entities who have already executed a confidentiality agreement to execute a new confidentiality agreement.

4.     **Bid Deadline**

All bids must be submitted to the Debtor's counsel, John Rizzardi, Cairncross & Hempelmann, P.S., 524 Second Avenue, Suite 500, Seattle, WA 98104, and **actually received by 3:00 p.m. (Pacific Daylight Time) on July 19, 2013** (the "Bid Deadline).

5.     **Qualified Bids**

Only bids that are received from Qualified Bidders before the Bid Deadline and that include documents that satisfy each of the requirements set forth below (each, a "**Qualified Bid**") will be considered at the auction for the Debtor's assets (the "**Auction**"). Qualified Bids must, at a minimum:

(a)   state: (i) whether the Qualified Bidder offers to purchase all or only a portion of the Debtor's assets; (ii) set forth the total purchase price and components thereof (e.g., cash, credit bid, or a combination); and (iii) if not already provided, describe the Qualified Bidder's source of funding;

(b)   to the extent the Qualified Bid is for all of the Debtor's assets, state that the Qualified Bidder offers to purchase all or substantially all of the Debtor's assets for a purchase price or other value that is equal to or greater than the sum of the Purchase Price, plus (i) the amount of the Break-Up Fee (as defined below), plus (ii) $50,000.00.

(c)   be irrevocable until entry of a Sale Order (as defined below);

(d)   include a duly authorized and executed purchase and sale agreement (the "**Proposed PSA**") substantially in the form attached hereto as Exhibit 1 (the "**Form PSA**"), together with all exhibits and schedules thereto;

(e)   include "blacklined" or marked copies of the Proposed PSA to show differences between the Proposed PSA and the Form PSA;

(f)   be accompanied by a deposit (by means of a certified bank check from a domestic bank or by wire transfer payable to the Debtor) in an amount equal to the greater of: (i) $100,000 and (ii) ten percent (10%) of the total purchase price set forth in the bid (the "**Bid Deposit**");

(g)   not be conditioned on the outcome of unperformed due diligence by the Qualified Bidder, and include an acknowledgement and representation that the Qualified Bidder has had an opportunity to conduct any and all required due diligence prior to making its bid;

(h)   not be conditioned upon further approval by the Court of any bid protections, such as a break-up fee, termination fee, expense reimbursement or similar type of payment (unless such bid protection is approved by order of the Court);

(i)   include written evidence of a firm, irrevocable commitment for financing from a creditworthy bank or financial institution that will finance the purchase without (i) alteration of conditions or (ii) delays, and that is not

contingent as of the Auction; or, other evidence of ability, as determined in the Sales Agent's reasonable business judgment, to consummate the transaction contemplated by the Proposed PSA;

(j) fully disclose the identity of each entity that will be bidding for all or any portion of the Debtor's assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation, including the identification of the Qualified Bidder's principal advisors;

(k) not be conditioned on the assumption or assignment of any contract or lease;

(l) if the Proposed PSA contemplates assumption and assignment of any executory contract or unexpired lease, include (i) an acknowledgment and representation that the Qualified Bidder will assume the Debtor's obligations under the executory contracts and unexpired leases proposed to be assumed and assigned (or identify, with particularity, which of the Debtor's contracts and leases the Qualified Bidder does not wish to assume); and (ii) full details of the Qualified Bidder's proposal for the treatment of any related cure costs;

(m) include an acknowledgement and representation that the Qualified Bidder (i) relied solely upon its own independent review, investigation and/or inspection of any documents and/or all or any portion of the Debtor's assets in making its bid; (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding all or any portion of the Debtor's assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Proposed PSA; and (iii) disclose any agreements made or intended to be made that involve any owners or senior management of the Debtor;

(n) include a representation that the Qualified Bidder can close within ten days after a Sale Order (as defined below) is entered;

(o) include an agreement by the Qualified Bidder to indemnify the estate from any claim for a broker's fee, finder's fee, or similar fee;

(p) include evidence, in form and substance reasonably satisfactory to the Sales Agent, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Proposed PSA;

(q) include evidence of the Qualified Bidder's ability to comply with Section 365 of the Bankruptcy Code (to the extent applicable), which includes providing adequate assurance of such Qualified Bidder's ability to perform the contracts and leases proposed in its bid to be assumed by, or subleased to, the Qualified Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such

contracts and leases;

(r) include a covenant to hold the Sales Agent harmless from any and all damages arising out of or related to the Sale and/or the sale procedures set forth herein; and

(s) contain other information reasonably requested by the Sales Agent.

A Qualified Bid may consist of a bid for the Debtor as a going concern or for any or all of the Debtor's assets; and may contain a credit bid component only if the Qualified Bidder is a secured creditor of the Debtor.

## 6.    Initial Bid Evaluation

Whether the bid of a Qualified Bidder meets the foregoing requirements to become a Qualified Bid will be determined solely by the Sales Agent on behalf of the Debtor, in consultation with the Debtor's counsel. In evaluating bids, the Sales Agent: (a) will exercise reasonable business judgment, (b) may confer with the Debtor's management, and (c) may reject any bid that (i) does not meet any of the requirements set forth above, (ii) entitles the Qualified Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment (unless the same is approved by order of the Court), or (iii) is contrary to the best interests of the estate, its creditors, and other parties in interest. The Sales Agent may, in its sole discretion, inform any Qualified Bidder whose bid is subject to rejection of the basis for rejection or potential rejection, and allow such Qualified Bidder to submit a revised bid no later than 24 hours following such notice of rejection or potential rejection; provided, however, that the Sales Agent may not disclose the identity of any Qualified Bidder to another Qualified Bidder in the course of providing such notice.

The Sales Agent will select those Qualified Bidders whose bids are determined to be Qualified Bids and will, by July 23, 2013, notify such Qualified Bidders (the "**Final Bidders**") that they have been selected to participate in the Auction.

If the Debtor's counsel does not receive any other Qualified Bids greater than the amount of the Stalking Horse bid by the Bid Deadline, the Sales Agent will not hold the Auction, and shall report the same to the Court. In the event that the Debtor's counsel receives only one additional Qualified Bid in addition to the Stalking Horse bid by the Bid Deadline, the Sales Agent may, in its sole discretion, cancel the Auction and either: (a) designate the Stalking Horse bid as the Winning Bid; (b) designate the additional Qualified Bid as the Winning Bid; or (c) decline to designate the Stalking Horse bid or the additional Qualified Bid as the Winning Bid, and report the same to the Court. In the event no Winning Bid is approved by the Sales Agent, the Sales Agent, on behalf of the Debtor, shall, as set forth below in Section 9, file, by the date that the Auction Report (as defined below) would otherwise be due, a request for approval of alternative disposition procedures.

## 7.    Auction Procedures

The Debtor shall, no later than **5:00 p.m. July 19, 2013**, circulate to the One PacificCoast Bank, Washington Federal, Columbia State Bank and the Official Unsecured Creditors' Committee, a copy of each Qualified Bid actually received by the Debtor by the Bid Deadline.

If the Sales Agent determines that there is more than one Qualified Bid, the Sales Agent shall conduct the Auction at the offices of Debtor's counsel, 524 Second Avenue, Suite 500,

Seattle, WA, beginning at **9:00 a.m. (Pacific Daylight Time) on July 30, 2013,** or at such later time or other place as agreed to by the Sales Agent and all Final Bidders. The Auction shall be conducted by the Sales Agent in accordance with the following procedures:

(a) Only the Sales Agent on behalf of the Debtor, Debtor's counsel, and representatives of any Final Bidders shall be entitled to attend the Auction, and only Final Bidders shall be entitled to make any Subsequent Bids (as defined below). Secured creditors may have observers present at the Auction, and counsel for the Official Committee of Unsecured Creditors may also observe the Auction.

(b) At the Auction, all Final Bidders shall be permitted to increase their Qualified Bids in accordance with the procedures set forth herein (each, a "**Subsequent Bid**"). All Subsequent Bids presented during the Auction shall be made and received in one room on an open basis. All participating Final Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each participating Final Bidder shall be fully disclosed to all other Final Bidders and that all material terms of each Subsequent Bid presented during the Auction will be fully disclosed all other participating Final Bidders throughout the entire Auction.

(c) All Final Bidders at the Auction must have at least one individual representative with authority to bind such Final Bidder present in person at the Auction.

(d) All proceedings at the Auction shall be conducted before and transcribed by a court stenographer and/or video recorded. Any video record of the proceedings shall be admissible in any proceeding before this Court.

(e) At least one (1) day prior to the Auction, the Sales Agent will advise all Final Bidders of which Qualified Bid the Sales Agent has determined to be the then highest or otherwise best offer for the Debtor's assets (the "**Starting Bid**").

(f) Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one Subsequent Bid is submitted (i) by a Final Bidder that improves upon such Final Bidder's immediately prior Qualified Bid and meets the overbid requirement set forth in paragraph (g) below; and (ii) that the Sales Agent determines in its reasonable business judgment, is a higher or otherwise better offer than the then-highest Qualified Bid.

(g) Bidding at the Auction shall be in increments of U.S. $50,000.00 and shall continue until such time as the highest and best bid is determined by the Sales Agent in its reasonable business judgment. The Sales Agent, in its sole discretion, shall have the right to modify the bidding increments throughout the course of the Auction. For the purpose of evaluating the value of the consideration provided by each bid (including any Subsequent Bid) presented at the Auction, the value will: (i) be deemed to be the net present and future consideration payable to the Debtor and (ii) take into account any additional liabilities to be assumed by a Final Bidder as well

as any additional costs that may be imposed on the Debtor under any such bid.

(h) After the first round of bidding and between each subsequent round of bidding, the Sales Agent shall announce the Qualified Bid or Subsequent Bid, as the case may be, that the Sales Agent has determined in its reasonable business judgment, to be the then-highest or best bid (the "**Leading Bid**"). A round of bidding will conclude after each participating Final Bidder has had an opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

(i) At the conclusion of the Auction pursuant to paragraph (g) above, the Sales Agent will announce the Qualified or Subsequent Bid that the Sales Agent has determined in its reasonable business judgment to be the highest and best bid (the "**Winning Bid**" and the applicable bidder the "**Winning Bidder**") and such Winning Bid will be presented to the Court by the Sales Agent for approval, along with the second highest and best Qualified Bid (the "**Alternative Bid**" and the applicable bidder the "**Alternative Bidder**"). The Debtor will be deemed to have accepted any Qualified Bid only when such Qualified Bid is determined to be the Winning Bid and has been approved by the Court.

(j) At the Auction, the Sales Agent, after consultation with the Sales Agent, may employ and announce additional or revised procedural rules that are fair and reasonable under the circumstances (including, for example, the imposition of reasonable time increments upon bidders for returning a Subsequent Bid, the disqualification of a bidder for any unreasonable delay in the bidding process for conducting the Auction, or a change to the minimum incremental increase between Subsequent Bids); provided, however, that such rules are (i) not inconsistent with the Bankruptcy Code or any order of the Court entered in connection with the Sale and (ii) disclosed to all persons present at the Auction.

The Stalking Horse shall, no later than 5:00 p.m. on Friday, July 26, 2013, inform the Debtor, and file with the Court, its best estimate of the amount of the Break-Up Fee (as defined in the APA) based on the actual third-party, out-of-pocket expenses the Stalking Horse has incurred through July 26, 2013, which amount shall be announced at the Auction.

## 8. **Credit Bidding**

Any creditor (including, without limitation, One PacificCoast Bank, Washington Federal, Columbia Bank, Skagit Farmers and RSF Mezzanine Fund) holding an allowed claim secured by all or any portion of the Debtor's assets shall be entitled to, in connection with the foregoing procedures and provided that such creditor is a Qualified Bidder, credit bid to the extent of such creditor's security interest pursuant to 11 U.S.C. § 363(k) and other applicable law. Notwithstanding anything herein to the contrary, such secured creditors will not be required to provide proof of funding (either in connection with becoming a Qualified Bidder or in order for their bids to be deemed Qualified Bids), and any secured creditor that is a financial institution will not be required to submit a Bid Deposit in order for its bid to be deemed a Qualified Bid.

To the extent the Sales Agent receives one or more Qualified Bids which contain a credit

bid component and there is any dispute, including a dispute over how such credit bid shall be given value in the Auction and treated vis-à-vis any other Qualified Bidder at the Auction or whether such creditor may participate as a Final Bidder, the Court shall hold a hearing on July 25, 2013 at 9:30 a.m. to adjudicate such credit bid disputes. Any Qualified Bidder intending to object must file a written objection with the Court on or before July 23, 2013.

## 9. The Sale Hearing

The Debtor shall, no later than **July 22, 2013** file a motion to approve the sale of the Debtor's assets (the "**Sale Motion**") seeking entry by the Court of an order that, among other things, authorizes and approves the sale of the Debtor's assets (a) to the Stalking Horse, in the event no other Qualified Bid is received that is designated by the Sales Agent as the Winning Bid or (b) to the Winning Bid, if a Qualified Bid is received and accepted by the Sales Agent as the Winning Bid. If there the Sales Agent elects to conduct an Auction, the deadline set by this paragraph is moot.

In the event an Auction is conducted, the Sales Agent, on behalf of the Debtor, shall, by **August 2, 2013**, file a report (the "**Auction Report**") that identifies, among other things: (a) the identity of the Winning Bidder; (b) the identity of the Alternative Bidder; (c) an executed purchase and sale agreement; and (d) any additional executory contracts or leases to be assumed and assigned to the Winning Bidder in connection with the Sale. The Debtor shall file contemporaneous with the filing of the Auction Report, the Sales Motion for authorization and approval of the sale of the Debtor's Assets to the Winning Bidder. The Debtor shall annex to the Sales Motion, as an exhibit, a proposed order approving the Sale on the terms set forth in the Winning Bid, and shall serve the Sales Motion and the Auction Report on all parties in interest in this case.

A hearing seeking Court approval of the Sale on the terms set forth in the Winning Bid (the "**Sale Hearing**") shall be held **during the week of August 12, 2013** at a date and time certain to be determined.

**Objections to the Sale shall be filed and served by August 6, 2013, and the Debtor's reply shall be due no later than August 8, 2013.**

If, following the entry of the Sale Order by the Court, the Winning Bidder fails to consummate a transaction with the Debtor, then the Alternative Bid shall be deemed the Winning Bid and the Debtor shall be authorized to consummate a transaction in respect of the Alternative Bid without further order of the Court.

## 10. Closing

The Sale shall close no later than ten (10) days after the Court enters the Sale Order (the "**Closing Deadline**"), unless the Debtor, in the Sale's Agent's sole discretion, requires additional time for closing. In such an event, the Sales Agent shall file a status report with the Court summarizing the nature of and reasons for such delay. Any party in interest may request a status hearing before this Court on three (3) business days' notice to raise concerns with the closing of the Sale.

## 11. Failure to Consummate Purchase

If the Winning Bidder fails to consummate the Sale by the Closing Deadline, and such failure is the result of a breach by the Winning Bidder, the Winning Bidder's Bid Deposit shall

be fully forfeited to the Debtor, and the Debtor shall be entitled to seek all additional available damages or other remedies from or against the Winning Bidder.

## 12. **Return of Bid Deposits**

Subject to the foregoing, the Bid Deposits of the Winning Bidder and the Alternative Bidder shall be retained by the Debtor, and such Deposits shall be promptly returned following the expiration of 14 days after entry of the Sale Order. Bid Deposits of all other Qualified Bidders shall be promptly returned following entry of the Sale Order.

## 13. **Modifications**

At any time before the Sale Hearing, the Sales Agent may, in an exercise of its reasonable business judgment and in consultation with the Sales Agent: (a) reject any bid, including the Winning Bid and the Alternative Bid, that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the procedures herein, or any other orders of the Court, or (iii) contrary to the best interests of the estate, its creditors, and other parties in interest; and (b) designate another Qualified Bid as the Winning Bid or the Alternative Bid.

## 14. **Other**

In the event that the Sales Agent and any party disagree as to the interpretation or application of the procedures set forth herein, the Court will have jurisdiction to hear and resolve such dispute.

# EXHIBIT 1 TO SALE PROCEDURES

## Form PSA

[INTENTIONALLY OMITTED – SEE ORIGINAL PROPOSED ORDER]

Exhibit B
Proposed Form of Sale Order

{02354287.DOCX;1 }
Exhibit B to Asset Purchase Agreement
#903797 v1 / 45616-001

**Exhibit A**

1

2

3

4

5

6

7

8

9

10

11

12

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

13 | In re:

14 | CASCADE AG SERVICES, INC.,

15 | Debtor.

IN CHAPTER 11 PROCEEDING

NO. 12-18366-KAO

ORDER (A) AUTHORIZING AND
APPROVING THE SALE OF ASSETS
FREE AND CLEAR OF ALL LIENS,
CLAIMS, ENCUMBRANCES AND OTHER
INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF
THE ASSUMED EXECUTORY
CONTRACTS AND (C) GRANTING
RELATED RELIEF

21      Upon the motion, dated July 22, 2012 (the "**Sale Motion**"), of Cascade Ag Services, Inc.,

22 the debtor and debtor in possession in the above-captioned chapter 11 case (the "**Debtor**"), for

23 entry of an order (the "**Sale Order**") pursuant to sections 105, 363 and 365 of Title 11 of the

24 United States Code (the "**Bankruptcy Code**") and Rules 2002 and 9014 of the Federal Rules of

25 Bankruptcy Procedure (the "**Bankruptcy Rules**"): (a) authorizing and approving the sale (the

26

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 1
{02354299.DOCX;1}

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington 98104-2323
office 206 587 0700   fax 206 587 2308

1   "**Sale**") of the Acquired Assets[1] free and clear of all liens, claims, encumbrances and other

2   interests (excluding the Assumed Liabilities) pursuant to the terms and conditions of that certain

3   asset purchase agreement (the "**APA**")[2], dated August 2, 2013, by and between the Debtor (also

4   referred to herein as the "**Seller**") and Pleasant Valley Farms, LLC, formerly known as Triak

5   Holdings, LLC (the "**Purchaser**"); (b) authorizing and approving the assumption and assignment

6   of the Assumed Executory Contracts; and (c) granting related relief; and the Court having

7   entered the *Order Approving Sale Procedures* on June 28, 2013 (Dkt. No. 512) (the "**Sale**

8   **Procedures Order**"); and upon adequate and sufficient notice of the Sale Motion, the Auction

9   (as defined in the Sale Motion and the Sale Procedures Order), the hearing before the Court on

10  August 20, 2013 (the "**Sale Hearing**") and any other related transactions having been given in

11  the manner directed by the Court pursuant to the Sale Procedures Order; and the Court having

12  reviewed and considered (w) the Sale Motion, (x) the objections to the Sale Motion, if any, (y)

13  the Auction Report (as defined in the Sale Procedures Order and the Sale Motion), and (z) the

14  statements of counsel and evidence presented in support of the relief requested by the Debtor in

15  the Sale Motion at the Sale Hearing; and it appearing that the Court has jurisdiction over this

16  matter; and it further appearing that the legal and factual bases set forth in the Sale Motion, the

17  Auction Report, and at the Sale Hearing establish just cause for the relief granted herein; and it

18  appearing that the relief requested in the Sale Motion is in the best interests of the Debtor, its

19  estate and creditors and other parties in interest; and upon the record of the Sale Hearing and all

20  other pleadings and proceedings in this Chapter 11 case, including the Sale Motion and the

21  Auction Report; and after due deliberation thereon and good and sufficient cause appearing

22  therefor,

23

24

25  [1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed in the APA and the
    Sale Motion, as applicable. To the extent of any inconsistency, the APA shall govern.

26  [2] A copy of the APA is attached as Exhibit A to the Auction Report filed by the Debtor on August 2, 2013 (Dkt. No.
    ##).

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 2
{02354299.DOCX;1.}

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington  98104-2323
office 206 587 0700   fax 206 587 2308

THE COURT HEREBY FINDS AND DETERMINES THAT:[3]

## Jurisdiction, Final Order, and Statutory Predicates

A.    This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief requested in the Sale Motion are Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006, 9007 and 9014 of the Bankruptcy Rules.

C.    This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

## Notice of the Sale and Auction

D.    Actual written notice of the Sale Motion was provided to (i) all parties to which the Court has directed the Debtor to give notice in its *Order Granting Debtor's Motion to Establish Notice and Administrative Procedures* (Dkt. #121), (ii) all creditors, (iii) counsel to the Purchaser; (iv) all non-debtor counterparties to the Debtor's executory Contracts and unexpired leases; and (v) all parties who are known to claim liens or other interests upon the Acquired Assets (collectively, the "**Notice Parties**").

E.    Service of the Sale Motion on the Notice Parties on July ___, 2013, and publication of a notice of the Sale in the *Wall Street Journal – Western Edition*, and the *Seattle Times* as stated in the Affidavits of Publication filed at Dkt. No. 526 was reasonably calculated to provide all interested parties with timely and proper notice of the Auction, Sale, and Sale Hearing.

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are incorporated herein to the extent not inconsistent herewith. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 3
{02354299.DOCX;1}

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington 98104-2323
office 206 587 0700   fax 206 587 2308

F.      In accordance with the provisions of the Sale Procedures Order, the Debtor has served notice upon each counterparty to an executory Contract that the Debtor seeks to assume and assign to the Purchaser on the Closing Date (defined below) identifying all amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all monetary defaults and pay all actual pecuniary losses under the relevant Contract (the "**Cure Amounts**").  The service of such notice was good, sufficient, and appropriate under the circumstances, and no further notice need be given in respect of establishing a Cure Amount for the Contracts.  Each counterparty to an executory Contract that the Debtor seeks to assume and assign to the Purchaser on the Closing Date has had an opportunity to object to the Cure Amounts set forth in the notice and to the assumption and assignment to the Purchaser of the applicable Contract.

G.      As evidenced by the affidavits of service and publication previously filed with the Court, proper, timely, adequate, and sufficient notice of the Sale Motion, Auction, Sale, Sale Hearing and the transactions contemplated thereby, including the assumption and assignment of the Assumed Executory Contracts to the Purchaser, was provided in accordance with orders previously issued by the Court, sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014.  The notices described herein were good, sufficient and appropriate under the circumstances, and no other or further notice of the Sale Motion, Auction, Sale, Sale Hearing or the assumption and assignment of the Assumed Executory Contracts to the Purchaser is or shall be required.

H.      The disclosures made by the Debtor concerning the Sale Motion, APA, Auction, Sale, assumption and assignment of the Assumed Executory Contracts to the Purchaser, and Sale Hearing were good, complete, and adequate.

I.      A reasonable opportunity to object and be heard with respect to the Sale Motion, and the relief requested therein, including the assumption and assignment of the Assumed

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 4
{02354299.DOCX;1}

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington  98104-2323
office 206 587 0700   fax 206 587 2308

Executory Contracts to the Purchaser and any Cure Costs related thereto, has been afforded to all interested persons and entities, including the Notice Parties.

## Good Faith of Purchaser

J.     The APA was negotiated, proposed and entered into by the Seller and the Purchaser without collusion, in good faith and from arm's-length bargaining positions.

K.     The Purchaser is not an "insider" or "affiliate" of the Debtor as those terms are defined in the Bankruptcy Code. Neither the Debtor nor the Purchaser has engaged in any conduct that would cause or permit the APA to be avoided under section 363(n) of the Bankruptcy Code. Specifically, the Purchaser has not acted in a collusive manner with any person and the aggregate price paid by the Purchaser for the Acquired Assets (the "**Purchase Price**") was not controlled by any agreement among the bidders.

L.     The Purchaser is purchasing the Acquired Assets in good faith and is a good-faith buyer within the meaning of section 363(m) of the Bankruptcy Code. Indeed, the Purchaser proceeded in good faith in connection with all aspects of the Sale, including: (i) the Sale Procedures Order; (ii) neither inducing nor causing the Debtor's Chapter 11 filing; and (iii) disclosing all payments to be made by the Purchaser in connection with the Sale. Accordingly, the Purchaser is entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code.

## Highest and Best Offer

M.     The Debtor conducted an auction process in accordance with, and has otherwise complied in all respects with, the Sale Procedures Order. The auction process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets. The Auction was duly noticed and conducted in a non-collusive, fair and good-faith manner and a reasonable opportunity has been given to any interested party to make a higher or otherwise better offer for the Acquired Assets.

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 5
{02354299.DOCX;1}

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington  98104-2323
office 206 587 0700   fax 206 587 2308

**No Fraudulent Transfer**

N.      The consideration provided by the Purchaser pursuant to the APA (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Acquired Assets, (iii) will provide a greater recovery to the Debtor's estate than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.  No other person, entity, or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtor's estate than the Purchaser.  The Debtor's determination that the APA constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtor's business judgment.  Approval of the Sale Motion and the APA, and the consummation of the transactions contemplated thereby, is in the best interests of the Debtor, its estate, creditors and other parties in interest.

O.      The Purchaser is not a mere continuation of the Debtor or its estate and there is no continuity of enterprise between the Purchaser and the Debtor.  The Purchaser is not holding itself out to the public as a continuation of the Debtor.  The Purchaser is not a successor to the Debtor or its estate and the Sale does not amount to a consolidation, merger, or *de facto* merger of the Purchaser and the Debtor.

**Validity of Transfer**

P.      The Debtor has (i) full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, (ii) all corporate authority necessary to consummate the transactions contemplated by the APA, and (iii) taken all corporate action necessary to authorize and approve the APA and the consummation of the transactions contemplated thereby.  The Sale has been duly and validly authorized by all necessary corporate action.  No consents or approvals, other than those expressly provided for in the APA, are

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 6
{02354299.DOCX;1}

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington  98104-2323
office 206 587 0700   fax 206 587 2308

required for the Debtor to consummate the Sale, the APA or the transactions contemplated thereby.

Q.     The APA was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia.  Neither the Debtor nor the Purchaser is fraudulently entering into the transaction contemplated by the APA.

R.     The Debtor has good and marketable title to the Acquired Assets and is the lawful owner of the Acquired Assets.  Subject to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets to the Purchaser will be, as of the closing of the transactions contemplated by the APA (the "**Closing Date**"), a legal, valid, and effective transfer of the Acquired Assets, which transfer vests or will vest the Purchaser with all right, title, and interest of the Seller to the Acquired Assets free and clear of (i) all liens and encumbrances relating to, accruing or arising any time prior to the Closing Date (collectively, "**Liens**") and (ii) all debts arising under, relating to or in connection with any act of the Debtor or claims (as that term is defined in section 101(5) of the Bankruptcy Code and herein), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of this case, and whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, rights with respect to Claims (as defined below)) and Liens: (x) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, the Debtor's or the Purchaser's interests in the Acquired Assets, or any similar rights, or (y) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including any restriction of use, voting, transfer, receipt of income or other exercise of any attributes of ownership) (collectively, as defined in this clause (ii), "**Claims**"), relating to,

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 7
{02354299.DOCX;1}

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington  98104-2323
office 206 587 0700   fax 206 587 2308

Exhibit A

Case 12-18366-KAO    Doc 554    Filed 08/02/13    Ent. 08/02/13 17:14:26    Pg. 81 of 97

accruing or arising any time prior to the Closing Date, with the exception of Permitted

Encumbrances and Assumed Liabilities (as those terms are defined in the APA).

### Section 363(f) is Satisfied

S.       The conditions of Section 363(f) of the Bankruptcy Code have been satisfied in

full; therefore, the Debtor may sell the Acquired Assets free and clear of any interest in the

property.  The Purchaser would not have entered into the APA and would not consummate the

transactions contemplated thereby if the Sale and the assumption by the Purchaser of liabilities

and obligations as set forth in the APA were not free and clear of all Liens and Claims, other

than the Permitted Encumbrances and Assumed Liabilities.

T.       Unless otherwise expressly included in the Permitted Encumbrances or Assumed

Liabilities, the Purchaser shall not be responsible for any Liens or Claims, including in respect of

the following, unless otherwise prohibited by applicable law or statute:  (i) any labor or

employment agreements; (ii) any mortgages, deeds of trust and security interests; (iii) any

intercompany loans and receivables between the Debtor and any non-debtor subsidiary, (iv) any

pension, welfare, compensation or other employee benefit plans, agreements, practices and

programs, including, without limitation, any pension plan of the Debtor or any of its affiliates;

(v) any other employee, worker's compensation, occupational disease or unemployment or

temporary disability related claim, including, without limitation, claims that might otherwise

arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as

amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the

Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker

Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967

and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities

Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state

discrimination laws, (k) state unemployment compensation laws or any other similar state laws,

or (l) any other state or federal benefits or claims relating to any employment with the Debtor or

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 8
{02354299.DOCX;1}

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington  98104-2323
office 206 587 0700   fax 206 587 2308

any of its predecessors; (vi) Claims or Liens arising under any environmental laws, rules, or regulations of any Governmental Authority ("**Environmental Laws**") with respect to any assets owned or operated by the Debtor or any of its corporate predecessors (or any of their respective affiliates) at any time prior to the Closing Date and any of the Debtor's liabilities other than the Assumed Liabilities; (vii) any bulk sales or similar law; (vii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (ix) any theories of successor liability, unless prohibited by law (as further defined in the APA, the "**Excluded Liabilities**").

U.      The Debtor may sell the Acquired Assets free and clear of all Liens and Claims against the Debtor, its estate, or any of the Acquired Assets (except the Assumed Liabilities and Permitted Encumbrances) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Liens or Claims against the Debtor, its estate or any of the Acquired Assets who did not object or who withdrew their objections to the Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

## Compelling Circumstances for an Immediate Sale

V.      Good and sufficient reasons for approval of the APA and the Sale have been articulated.  The relief requested in the Sale Motion is in the best interests of the Debtor, its estate, its creditors and other parties in interest.  The Debtor has demonstrated (i) good, sufficient and sound business purposes and justifications for approving the APA and (ii) compelling circumstances for the Sale outside of (a) the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code and (b) a plan of reorganization, in that, among other things, the immediate consummation of the Sale to the Purchaser is necessary and appropriate to maximize the value of the Debtor's estate and the Sale will provide the means for the Debtor to maximize distributions to its creditors.

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 9
{02354299.DOCX;1}

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington  98104-2323
office 206 587 0700   fax 206 587 2308

Exhibit A

Case 12-18366-KAO    Doc 554    Filed 08/02/13    Ent. 08/02/13 17:14:26    Pg. 83 of 97

W.     To maximize the value of the Acquired Assets and preserve the viability of the business to which the Acquired Assets relate, it is essential that the Sale occur within the time constraints set forth in the APA.  Time is of the essence in consummating the Sale.

X.     Given all of the circumstances of this Chapter 11 case and the adequacy and fair value of the Purchase Price under the APA, the proposed Sale constitutes a reasonable and sound exercise of the Debtor's business judgment and should be approved.

Y.     The Sale does not constitute a *sub rosa* Chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.  The Sale neither impermissibly restructures the rights of Debtor's creditors nor impermissibly dictates a liquidating plan of reorganization for the Debtor.

Z.     The consummation of the Sale and the assumption and assignment of the Assumed Executory Contracts is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(m) and 365 thereof.

## Adequate Assurance of Future Performance

AA.     The Purchaser has demonstrated adequate assurance of future performance with respect to the Assumed Executory Contracts pursuant to section 365(b)(1)(C) of the Bankruptcy Code.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

## General Provisions

1.     The relief requested in the Sale Motion, including approval of the Sale, is granted to the extent set forth in this Sale Order.

2.     Any objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, settled by announcement during the Sale Hearing, or by stipulation filed with the Court, including any and all reservations of rights included in such objections or otherwise, are hereby denied and overruled with prejudice.  Those parties who did not object or

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 10
{02354299.DOCX;1}

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington  98104-2323
office 206 587 0700   fax 206 587 2308

that withdrew their objections to the Sale Motion at or prior to the Sale Hearing are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.

### Approval of the APA

3.      The APA, all agreements and documents ancillary thereto (collectively, the "**Ancillary Agreements**") and all of the terms and conditions thereof are hereby approved.

4.      Pursuant to Sections 363(b) and (f) of the Bankruptcy Code, the Debtor is authorized and empowered to take any and all actions necessary or appropriate to (i) consummate the Sale pursuant to, and in accordance with, the terms and conditions of the APA, (ii) close the Sale as contemplated in the APA and this Sale Order, and (iii) execute and deliver, perform under, consummate, implement and fully close the APA, including the assumption and assignment of the Assumed Executory Contracts to the Purchaser, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and the Sale.

5.      This Sale Order shall be binding in all respects upon (a) the Debtor, (b) its estate, (c) all creditors of, and holders of equity interests in, the Debtor, (d) any holders of Liens, Claims or other interests in, against, or on (whether known or unknown) all or any portion of the Acquired Assets, (e) the Purchaser and all successors and assigns of the Purchaser, (f) the Acquired Assets and (g) any trustees, if any, subsequently appointed in the Debtor's Chapter 11 case or upon a conversion of this case to Chapter 7 under the Bankruptcy Code.  This Sale Order and the APA shall inure to the benefit of the Debtor, its estate and creditors, the Purchaser, and the respective successors and assigns of each of the foregoing.

### Transfer of the Acquired Assets

6.      Pursuant to sections 105(a), 363(b) and 363(f) of the Bankruptcy Code, the Debtor is authorized to transfer the Acquired Assets to the Purchaser on the Closing Date and such transfer shall constitute a legal, valid, binding, and effective transfer of such Acquired Assets and shall vest Purchaser with title to the Acquired Assets and, upon the Debtor's receipt

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 11
{02354299.DOCX;1}

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington  98104-2323
office 206 587 0700   fax 206 587 2308

Exhibit A

Case 12-18366-KAO   Doc 554   Filed 08/02/13   Ent. 08/02/13 17:14:26   Pg. 85 of 97

of the Purchase Price, other than Permitted Encumbrances and Assumed Liabilities, shall be free and clear of all Liens, Claims, and other interests of any kind or nature whatsoever, including successor or successor in interest liability and Claims in respect of the Excluded Liabilities, with such Liens, Claims, and interests to attach to the proceeds of the Sale in the order of their priority, with the same validity, force, and effect that they now have as against the Acquired Assets. Upon the Closing, the Purchaser shall take title to and possession of the Acquired Assets subject only to the Permitted Encumbrances and Assumed Liabilities.

7. Except with respect to Permitted Encumbrances and Assumed Liabilities, all persons and entities that are in possession of some or all of the Acquired Assets on the Closing Date are directed to surrender possession of such Acquired Assets to the Purchaser or its assignee at the Closing. The provisions of this Sale Order authorizing the sale of the Acquired Assets free and clear of Liens, Claims, and other interests (other than the Permitted Encumbrances and Assumed Liabilities) shall be self-executing and neither the Debtor nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.

8. The Debtor is hereby authorized to take any and all actions necessary to consummate the APA, including any actions that otherwise would require further approval by shareholders or its board of directors without the need of obtaining such approvals.

9. A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any liens and other encumbrances of record except the Assumed Liabilities or Permitted Encumbrances.

10. If any person or entity that has filed statements or other documents or agreements evidencing Liens on, or interests in, all or any portion of the Acquired Assets (other than statements or documents with respect to Permitted Encumbrances) shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties,

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 12
{02354299.DOCX;1}

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington 98104-2323
office 206 587 0700   fax 206 587 2308

termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all liens or interests which the person or entity has or may assert with respect to all or any portion of the Acquired Assets, the Debtor is hereby authorized and directed, and the Purchaser is hereby authorized, on behalf of the Debtor and each of the Debtor's creditors, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets.

11.     On the Closing Date, this Sale Order shall be construed, and shall constitute for any and all purposes, a full and complete general assignment, conveyance, and transfer of the Debtor's interests in the Acquired Assets. This Sale Order is and shall be effective as a determination that, on the Closing Date, all Liens, Claims, and other interests of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing Date, other than Permitted Encumbrances and Assumed Liabilities, shall have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected; provided, that such Liens, Claims, and other interests shall attach to the proceeds of the Sale in the order of their priority, with the same validity, force, and effect that they now have as against the Acquired Assets. This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 13
{02354299.DOCX;1}

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington  98104-2323
office 206 587 0700   fax 206 587 2308

12. To the greatest extent available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtor with respect to the Acquired Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Purchaser as of the Closing Date.

13. To the extent permitted by Section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Acquired Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of the Debtor's chapter 11 case or the consummation of the transactions contemplated by the APA.

### Prohibition of Actions Against the Purchaser

14. Except for the Permitted Encumbrances and Assumed Liabilities, or as otherwise expressly provided for in this Sale Order or the APA, the Purchaser shall not have any liability or other obligation of the Debtor or any of its predecessors or affiliates arising under or related to any of the Acquired Assets.

15. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the APA, and unless otherwise prohibited by applicable law or statute, the Purchaser shall not be liable for any Claims against the Debtor or any of its predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, including pursuant to any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including liabilities on account of warranties, intercompany loans and receivables between the Debtor and any non-debtor subsidiary, liabilities relating to or arising from any Environmental Laws, and any taxes arising, accruing or payable under, out of, in

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 14
{02354299.DOCX;1 }

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington 98104-2323
office 206 587 0700   fax 206 587 2308

1 connection with or in any way relating to the operation of any of the Acquired Assets prior to the

2 Closing.

3       16.     Except with respect to Permitted Encumbrances and Assumed Liabilities, all

4 persons and entities, including all debt security holders, equity security holders, governmental,

5 tax and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors,

6 holding Liens, Claims, or other interests of any kind or nature whatsoever (whether legal or

7 equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated

8 or unliquidated, senior or subordinate) against or in all or any portion of the Acquired Assets,

9 arising under or out of, in connection with or in any way relating to the Debtor, the Acquired

10 Assets, the operation of the Debtor's business prior to the Closing Date, or the transfer of the

11 Acquired Assets to the Purchaser, hereby are forever barred, estopped, and permanently enjoined

12 from asserting against the Purchaser, any of its affiliates, their respective successors or assigns,

13 their respective property or the Acquired Assets, such persons' or entities' Liens, Claims, or

14 interests in and to the Acquired Assets, including, the following actions:  (a) commencing or

15 continuing in any manner any action or other proceeding against the Purchaser, any of its

16 affiliates, its successors, assets or properties; (b) enforcing, attaching, collecting, or recovering in

17 any manner any judgment, award, decree, or order against the Purchaser, any of its affiliates, its

18 successors, assets, or properties; (c) creating, perfecting, or enforcing any Lien or other Claim

19 against the Purchaser, any of its affiliates, its successors, assets, or properties; (d) asserting any

20 setoff, right of subrogation, or recoupment of any kind against any obligation due the Purchaser

21 or any of its affiliates or successors; (e) commencing or continuing any action, in any manner or

22 place, that does not comply or is inconsistent with the provisions of this Sale Order, other orders

23 of the Court, the APA, or actions contemplated or taken in respect thereof; or (f) revoking,

24 terminating, failing, or refusing to transfer or renew any license, permit, or authorization to

25 operate any of the Acquired Assets or conduct any of the businesses operated with the Acquired

26 Assets.

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 15
{02354299.DOCX;1}

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington  98104-2323
office 206 587 0700   fax 206 587 2308

Exhibit A

Case 12-18366-KAO     Doc 554     Filed 08/02/13     Ent. 08/02/13 17:14:26     Pg. 89 of 97

17.     On the Closing Date, or as soon as possible thereafter, each of the Debtor's creditors is authorized and directed, and the Purchaser is hereby authorized, on behalf of each of the Debtor's creditors, to execute such documents and take all other actions as may be necessary to release Liens, Claims, and other interests in or on the Acquired Assets (except Permitted Encumbrances and Assumed Liabilities), if any, as provided for herein, as such Liens may have been recorded or may otherwise exist.

18.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Acquired Assets to the Purchaser in accordance with the terms of the APA and this Sale Order.

19.     The Purchaser has given substantial consideration under the APA for the benefit of the Debtor and its estate and creditors.  The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential Claims and Liens pursuant to this Sale Order, including under Paragraphs 14-18 hereof, which releases shall be deemed to have been given in favor of the Purchaser by all holders of Liens against or interests in, or Claims against, the Debtor or any of the Acquired Assets, other than holders of Liens or Claims relating to the Assumed Liabilities and Permitted Encumbrances.  The consideration provided by the Purchaser for the Acquired Assets under the APA is fair and reasonable and accordingly the purchase may not be avoided under section 363(n) of the Bankruptcy Code.

20.     Effective as of the Closing, the Purchaser and its successors and assigns shall be designated and appointed the Debtor's true and lawful attorney and attorneys, with full power of substitution, in the Debtor's name and stead, on behalf of and for the benefit of the Purchaser, its successors and assigns, for the following limited purposes:  to demand and receive from any third party any and all of the Acquired Assets and to give receipts and releases for and in respect of the Acquired Assets, or any part thereof, and from time to time to institute and prosecute against third parties for the benefit of the Purchaser, its successors and assigns, any and all

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 16
{02354299.DOCX;1 }

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington  98104-2323
office 206 587 0700   fax 206 587 2308

**Exhibit A**

Case 12-18366-KAO   Doc 554   Filed 08/02/13   Ent. 08/02/13 17:14:26   Pg. 90 of 97

proceedings at law, in equity or otherwise, that the Purchaser or its successors and assigns, may

deem proper for the collection or reduction to possession of any of the Acquired Assets.

**Assumption and Assignment of Assumed Executory Contracts**

21.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale, the Debtor's assumption and assignment to the Purchaser, and the Purchaser's assumption on the terms set forth in the APA, of the Assumed Executory Contracts is hereby approved and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

22.     The Debtor is hereby authorized and directed in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective as of the Closing Date, the Assumed Executory Contracts free and clear of all Claims, Liens, or other interests of any kind or nature whatsoever and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assumed Executory Contracts to the Purchaser.

23.     The Assumed Executory Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assumed Executory Contracts (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.  In addition, pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any further liability with respect to the Assumed Executory Contracts after such assignment to, and assumption by, the Purchaser, except as provided in the APA.

24.     All defaults or other obligations of the Debtor under the Assumed Executory Contracts arising or accruing prior to the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 17
{02354299.DOCX;1}

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington  98104-2323
office 206 587 0700   fax 206 587 2308

**Exhibit A**

Code) shall be cured pursuant to the terms of the APA on the Closing Date or as soon thereafter as reasonably practicable.

25.     To the extent a counterparty to an Assumed Executory Contract failed to timely object to a Cure Amount, such Cure Amount shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Amount at any time, and such Cure Amount, when paid, shall completely revive any Assumed Executory Contract to which it relates.  No sections or provisions of any Assumed Executory Contract that purport to provide for additional payments, penalties, charges, or other financial accommodations in favor of the non-debtor counterparty to such Assumed Executory Contract arising from or relating to the Sale and assignments authorized by this Sale Order shall have any force and effect.  Such provisions constitute unenforceable, anti-assignment provisions under section 365(f) of the Bankruptcy Code and are otherwise unenforceable under section 365(e) of the Bankruptcy Code.  No assignment of any Assumed Executory Contract pursuant to the terms of the APA shall in any respect constitute a default under any Assumed Executory Contract.

26.     Except for a non-debtor counterparty to a Contract who timely filed an objection to the assumption and/or assignment of its Contract within the timeframe provided by the Sale Procedures Order, (a) each non-debtor counterparty to each Assumed Executory Contract shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code and (b) the Purchaser shall enjoy all of the Debtor's rights and benefits under each such Assumed Executory Contract as of the applicable date of assumption without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof.

27.     Nothing in this Sale Order, the Sale Motion, or in any notice or any other document is or shall be deemed an admission by the Debtor that any Contract is an executory Contract or must be assumed and assigned pursuant to the APA or in order to consummate the Sale.

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 18
{02354299.DOCX;1}

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington  98104-2323
office 206 587 0700   fax 206 587 2308

28. The failure of the Debtor or the Purchaser to enforce at any time one or more terms or conditions of any Assumed Executory Contract shall not be a waiver of such terms or conditions or of the Debtor's and Purchaser's rights to enforce every term and condition of such Assumed Executory Contract.

29. All parties to the Assumed Executory Contracts are forever barred and enjoined from raising or asserting against the Purchaser any assignment fee, default, breach, Claim, pecuniary loss, or condition to assignment arising under or related to the Assumed Executory Contracts existing as of the Closing or arising by reason of the Closing, except for any amounts that are Assumed Liabilities.

## Other Provisions

30. This Sale Order, the APA, and the Ancillary Agreements shall be binding in all respects upon all creditors and equity-holders of the Debtor, all non-debtor parties to the Assumed Executory Contracts, all successors and assigns of the Debtor and its affiliates and subsidiaries, and any trustees, examiners, "responsible persons," or other fiduciaries appointed in the Debtor's Chapter 11 case or upon a conversion of this case to a case under Chapter 7 of the Bankruptcy Code. The APA and the Ancillary Agreements shall not be subject to rejection or avoidance under any circumstances.

31. The APA and the Ancillary Agreements may be modified, amended, or supplemented by the parties thereto, in a writing signed by the parties and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtor's estate.

32. Except to the extent expressly included in the Assumed Liabilities, or by applicable law or statute, the Purchaser and its affiliates shall have no liability, obligation, or responsibility under the WARN Act (29 U.S.C. §§ 210 *et seq*.), the Comprehensive Environmental Response Compensation and Liability Act, or any foreign, federal, state, or local

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 19
{02354299.DOCX;1}

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington 98104-2323
office 206 587 0700   fax 206 587 2308

**Exhibit A**

Case 12-18366-KAO    Doc 554    Filed 08/02/13    Ent. 08/02/13 17:14:26    Pg. 93 of 97

labor, employment, or Environmental Law by virtue of the Purchaser's purchase of the Acquired Assets or assumption of the Assumed Liabilities.

33.     The consideration provided by the Purchaser to the Debtor pursuant to the APA for the Acquired Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the laws of the United States, any state, territory, possession or the District of Columbia.

34.     The transactions contemplated by the APA are undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and such Sale are duly stayed pending such appeal.  The Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

35.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) this Chapter 11 case, (b) any subsequent Chapter 7 case into which this Chapter 11 case may be converted, or (c) any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the provisions of the APA or the terms of this Sale Order.

36.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

37.     The failure to specifically include any particular provision of the APA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety; provided, however, that this Sale Order shall govern if there is any inconsistency between the APA (including all Ancillary Agreements) and this Sale Order.  Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 20
{02354299.DOCX;1}

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington  98104-2323
office 206 587 0700   fax 206 587 2308

38.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtor is a party or which has been assigned by the Debtor to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets to Purchaser; (b) interpret, implement, and enforce the provisions of this Sale Order; (c) protect Purchaser against any Liens, Claims, or other interest in or against the Debtor or the Acquired Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale, and (d) enter any orders under section 363 or 365 of the Bankruptcy Code with respect to the Assumed Executory Contracts.

39.     Any amounts payable by the Debtor under the APA, unless otherwise ordered by this Court under the Bidding Procedures Order, shall (a) be paid in the manner provided in the APA without further order of this Court, (b) be allowed administrative claims in an amount equal to such payments in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code, (c) have the other protections provided in the Bidding Procedures Order and (d) not be discharged, modified or otherwise affected by any reorganization plan for the Debtor, except by an express agreement with the Purchaser, its successors or assigns.

40.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

///
///
///
///
///
///

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 21
{02354299.DOCX;1 }

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington 98104-2323
office 206 587 0700   fax 206 587 2308

Exhibit A

41. To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Sale Motion in this Chapter 11 case, the terms of this Sale Order shall govern.

///End of Order///

Presented by:

CAIRNCROSS & HEMPELMANN, P.S.

_____

John R. Rizzardi, WSBA No. 9388
Jessica Tsao, WSBA No. 44382
Attorneys for Debtor

ORDER (A) AUTHORIZING AND APPROVING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND (C) GRANTING RELATED
RELIEF - 22
{02354299.DOCX;1}

CAIRNCROSS & HEMPELMANN,
ATTORNEYS AT LAW
524 Second Avenue, Suite 500
Seattle, Washington 98104-2323
office 206 587 0700   fax 206 587 2308

**Exhibit A**

Exhibit C

Form of FIRPTA Certificate

## CERTIFICATE OF NON-FOREIGN STATUS

Section 1445 of the Internal Revenue Code provides that a transferee (buyer) of a U.S. real property interest must withhold tax if the Transferor (seller) is a foreign person.  To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by Cascade Ag Services, Inc., a Washington corporation ("**Transferor**"), the undersigned hereby certifies the following on behalf of Transferor:

1.       Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Code and Income Tax Regulations);

2.       Transferor is not a disregarded entity as defined in §1.1445-2(b)(2)(iii) of the Code;

3.       Transferor's Federal Employment Identification Number is _____;

4.       Transferor's address is: 13459 Dodge Valley Road, Mount Vernon, WA  98273

5.       Transferor understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment, or both; and

6.       Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct, and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

DATED this _____ day of _____, 2013.

**TRANSFEROR**:

CASCADE AG SERVICES, INC.

_____

By:  _____
Its:  _____